IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

ELIZABETH LYNNE HUTCHINSON,          )
                                     )
      Plaintiffs,                    )
                                     )          CIVIL ACTION NO:
vs.                                  )          CV-06-00700-WHA
                                     )          JURY DEMAND
                                     )
PHENIX CITY BOARD OF EDUCATION,      )
LARRY E. DICHIARA, officially as     )
as Superintendent of the Phenix City Schools )
                                     )
                                     )
      Defendants.                    )

**PLAINTIFF'S EVIDENTIARY SUBMISSION IN RESPONSE TO DEFENDANT
PHENIX CITY BOARD OF EDUCATION AND LARRY DICHIARA'S MOTION FOR
SUMMARY JUDGMENT**

      **COMES NOW**, Plaintiff, Elizabeth Lynne Hutchinson, through the undersigned counsel

and submits this Evidentiary Submission in response Defendants' Motions for Summary

Judgment.

1.      Plaintiff's Exh. A: Deposition Excerpts of Elizabeth Hutchinson

2.      Plaintiff's Exh. B: Deposition Excerpts of Penny Passmore

3.      Plaintiff's Exh. C: Deposition Excerpts of Brenda Densel

4.      Plaintiff's Exh. D: Deposition Excerpts of Larry DiChiara

5.      Plaintiff's Exh. E: Deposition Excerpts of Board Representative Lori White

6.      Plaintiff's Exh. F: Deposition Excerpts of Paula Pritchett

7.      Plaintiff's Exh. G: Deposition Excerpts of Reginald Sparks

8.      Plaintiff's Exh. H: Deposition Excerpts of Joshua Laney

9.      Plaintiff's Exh. I: Taped Transcript of Formal Complaint

10.     Plaintiff's Exh. J: Hutchinson Contract 2004-2005

11.     Plaintiff's Exh. K: Hutchinson Performance Evaluation 2004

12.     Plaintiff's Exh. L: Hutchinson Renewal 2004-2005

13.     Plaintiff's Exh. M: Hutchinson Performance Evaluation 2005

14.     Plaintiff's Ex. N: Hutchinson Termination Letter 2005

15.     Plaintiff's Exh. O: Hutchinson Non-Renewal 2005

16.     Plaintiff's Exh. P: Hutchinson Non-Renewal Letter 2005

17.     Plaintiff's Ex. Q: Phenix City Board of Education Sexual Harassment Policy

17.     Plaintiff's Exh. R: Phenix City Board of Education Complaint Procedure Policy

18.     Plaintiff's Exh. S: Newspaper Article: Re-segregation Fears for South Girard

19.     Plaintiff's Exh. T: Newspaper Article: South Girard Racial Issues

20.     Plaintiff's Exh. U: Defendant's EEOC Position Statement

21.     Plaintiff's Exh. V: Defendant's Response to Plaintiff's Discovery Requests

22.     Plaintiff's Exh. W: Plaintiff's Response to Defendant's Discovery Requests


Respectfully submitted,

s/ Joshua D. Wilson
Rocco Calamusa, Jr.
Joshua D. Wilson

*Attorneys for the Plaintiff*

2

**OF COUNSEL**
WIGGINS, CHILDS, QUINN & PANTAZIS, LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on this the  28th  day of   June  , 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Sidney S. Smith
Smith & Smith, PC
1503 Broad Street
Phenix City, AL 36867

/s/ Joshua D. Wilson
OF COUNSEL

# Hutchinson Deposition

1        thoroughly, ask you questions about

2        them.  If we need to take a break,

3        whatever, we'll do that.

4                    My first question was

5        (as read:) State in detail every fact

6        upon which you base the allegations in

7        your complaint that you were

8        discriminated against on the basis of

9        race with respect to harassment,

10       hostile work environment, work job

11       assignment, termination and/or

12       nonrenewal and other terms and

13       conditions.

14                    Your response (as read:)

15       From the first week of my employment

16       in July of 2003 until the last week of

17       my employment, Betty Cliatt basically

18       made these following allegations -- or

19       statements to you; is that correct?

20  A.   Yes, ma'am.

21  Q.   All right.  Let's go through them.

22       (As read:) Cliatt said she was going

23       to send me to the black school so I

```
 1          could learn to do things the black

 2          way.

 3                        When did she say that?

 4   A.     Off and on.

 5   Q.     Off and on?  Beginning from your first

 6          -- the time of your employment?

 7   A.     Yes, ma'am.

 8   Q.     As I understand it, you were employed

 9          2003-2004, 2004-2005.  You were at

10          South Girard the entire time.  You

11          were in what is -- what we're going to

12          refer to as the old cafeteria; is that

13          correct?

14   A.     Yes, ma'am.

15   Q.     You never worked in the new cafeteria?

16   A.     No, ma'am.

17   Q.     And your first supervisor that first

18          year was that Ms. Walker; is that

19          correct?

20   A.     Yes, ma'am.

21   Q.     And she's now deceased?

22   A.     Yes, ma'am.

23   Q.     Who was your assistant lunchroom
```

*ELIZABETH LYNNE HUTCHINSON -- 3/8/2007*                73

```
 1   Q.    All right.  Now, let me go back to

 2         your first comment.  You said that

 3         Betty Cliatt told you she was going to

 4         send you black school so you could

 5         learn to do things the black way.  And

 6         I believe you told me she said that

 7         throughout the time?

 8   A.    Yes, ma'am; constantly.

 9   Q.    Both years?

10   A.    Yes, ma'am.

11   Q.    Did you ever report that comment to

12         Ms. Walker?

13   A.    Yes, ma'am.

14   Q.    When did you tell Ms. Walker?

15   A.    Within the first week.

16   Q.    And what did you tell Ms. Walker?

17   A.    About how Betty liked to run her

18         mouth.

19   Q.    Okay.

20   A.    And Ms. Walker put a stop to it.

21   Q.    And Ms. Walker put a stop to it?

22   A.    Yes, ma'am.  Every time that Betty

23         would say something that she shouldn't
```

1    A.    Yes, ma'am.

2    Q.    Were you paid extra for that?

3    A.    I can't recall.

4    Q.    How many days was it?

5    A.    I'm guessing two days.

6    Q.    And that was -- would be your second

7          year of employment?

8    A.    Yes, ma'am.

9    Q.    And you met Ms. Densel at that time?

10   A.    Yes, ma'am.

11   Q.    Did you say anything to Ms. Densel

12         about any prior problems with

13         Betty Cliatt?

14   A.    Yes, ma'am.

15   Q.    What did you say?

16   A.    I had explained to Ms. Densel the way

17         Betty was; and also, other than

18         myself, Michelle was called in to

19         work.  And I didn't know Michelle was

20         to be there until we got to the

21         school.

22   Q.    Uh-huh.

23   A.    So it was just me and Michelle doing

*ELIZABETH LYNNE HUTCHINSON -- 3/8/2007*                76

```
 1        the cleaning, other than Brenda and
 2        Paula.
 3   Q.   Okay.
 4   A.   And so both myself and Michelle had
 5        explained to Brenda everything that
 6        had happened in the past.  And Brenda
 7        had told us both that she was going to
 8        see to it that things would be better
 9        and that things were going to be
10        different and things were going to
11        change.
12   Q.   Now, you said everything that happened
13        in the past; tell me what you mean by
14        that statement.
15   A.   When I was talking to Brenda?
16   Q.   Uh-huh.
17   A.   We had both explained to her on how
18        the conditions were.  That everybody
19        didn't want to follow the rules; that
20        they didn't want to prepare the food
21        as they were told to prepare the food,
22        and they didn't care about cleaning or
23        organizing.
```

1              But see, Brenda told us,

2      though, that she was going to make

3      sure that everything was changed; that

4      she had a system; that things would be

5      rotated around; that everybody would

6      have to do that same job behind the

7      other person.

8   Q.  During this meeting with Brenda, which

9      I understand occurred with you and

10     Michelle --

11  A.  Yes, ma'am.

12  Q.  Is that correct --

13  A.  (Witness nods head.)

14  Q.  -- before school started for the

15     2004,2005 school year?

16  A.  Yes, ma'am.

17  Q.  Did you ever mention to Ms. Densel

18     that it was because of race?

19              MR. DE GWECK:  Object to the

20              form.

21  A.  We spoke about race and other things.

22  Q.  What did you say about race?

23  A.  I had told her that every morning that

|    |    |                                          |
|----|----|------------------------------------------|
| 1  |    | Betty likes to run her mouth, always     |
| 2  |    | criticizing the white people; that all   |
| 3  |    | white people are nothing but white       |
| 4  |    | trailer trash.                           |
| 5  | Q. | Uh-huh.                                   |
| 6  | A. | And I presume that she had to be         |
| 7  |    | talking about me because I was the       |
| 8  |    | only white person sitting at the         |
| 9  |    | table.                                    |
| 10 | Q. | Now, that first year Judy Lloyd worked   |
| 11 |    | there.                                    |
| 12 | A. | The first year Judy Lloyd was there.     |
| 13 |    | If Betty was not picking on me, she      |
| 14 |    | was picking on Judy.                     |
| 15 | Q. | Did Betty have control over your work    |
| 16 |    | assignments?                             |
| 17 |    | MR. DE GWECK: Object to the              |
| 18 |    | form.                                    |
| 19 | Q. | Well, let me rephrase that. Did Betty    |
| 20 |    | Cliatt assign your duties to you?        |
| 21 | A. | No, ma'am. But, now, she told me what    |
| 22 |    | I was to do and not to do.               |
| 23 | Q. | And did you report that to anyone?       |

| | | |
|---|---|---|
| 1 | A. | Yes, ma'am. |
| 2 | Q. | And how often did these meetings |
| 3 | | occur? |
| 4 | A. | From what I can remember, I think we |
| 5 | | had a meeting probably every |
| 6 | | two weeks. |
| 7 | Q. | And during those meetings, did you |
| 8 | | make any complaints about being |
| 9 | | treated differently because you were |
| 10 | | white? |
| 11 | A. | I had spoken -- said that there were a |
| 12 | | few comments that were said and that I |
| 13 | | didn't like.  And I even told Betty |
| 14 | | that I felt like she was talking to me |
| 15 | | because I was the only white person. |
| 16 | Q. | And that would be the second year? |
| 17 | A. | Yes, ma'am. |
| 18 | Q. | Not the first year under Ms. Walker? |
| 19 | A. | No, ma'am.  Like I said, the first |
| 20 | | year, Ms. Walker, she stood up.  She |
| 21 | | come out a lot of times from the |
| 22 | | office.  She even helped us prepare |
| 23 | | the food.  And whenever Betty was on |

# Passmore Deposition

```
 1          Q.      Smiths is easier.  Do they

 2     have children?

 3          A.      No.

 4          Q.      Okay.  And your youngest?

 5          A.      My youngest is  -- She's

 6     married.  Carrie Cook, and she's married to

 7     Trey Cook.

 8          Q.      Where do they live?

 9          A.      They live in Phenix City.

10          Q.      What is your current position

11     with the Phenix City Board of Education?

12          A.      I'm the Child Nutrition

13     Program supervisor.

14          Q.      How long have you been in that

15     position?

16          A.      I'm in my fifth year.

17          Q.      So, did you start in the --

18          A.      I think it was the '02 or '03

19     school year.

20          Q.      Where did you -- Were you

21     hired into that position in the '02/'03

22     school year?

23          A.      Well, I was working -- started
```

Page 13

```
 1    Program, they selected me as the -- as the

 2    person to be that supervisor.

 3          Q.    Okay.  And who selected you?

 4          A.    Dr. Hackett.  He was the

 5    superintendent.

 6          Q.    Did you go through an

 7    interview process or anything?

 8          A.    Yes, sir.

 9          Q.    Who interviewed you?

10          A.    Dr. Hackett.

11          Q.    So, you were hired into that

12    position in 2002?

13          A.    I believe it was 2002.  It may

14    have been '03.

15          Q.    Okay.  And that position

16    encompasses how many different schools?

17          A.    We have, I think, counting

18    Head Start, we have ten.  We have nine

19    schools, counting Head Start, ten.

20          Q.    All right.  I'm going to get

21    you to run through those for me real quick.

22          A.    Okay.  We have Meadowlane,

23    Central High School, South Girard, Phenix
```

```
 1    City Intermediate School, Phenix City

 2    Elementary School, Sherwood, Ridgecrest,

 3    Westview, Lakewood Elementary, and Head

 4    Start.  Did I get everybody?

 5            Q.    All right.  We got Meadowlane,

 6    Central High School, South Girard is

 7    elementary?

 8            A.    No, sir.  South Girard is the

 9    junior high.

10            Q.    Okay.  And then Phenix City --

11    I'll just -- Can you go back and look at it?

12    What was after South Girard, Phenix City --

13            A.    Phenix City Intermediate

14    School.

15            Q.    And then. . .

16            A.    Phenix City Elementary school.

17            Q.    And Sherwood?

18            A.    Sherwood.

19            Q.    What is Sherwood?

20            A.    Sherwood's an elementary.

21            Q.    Okay.  Sherwood's elementary.

22    What about Ridgecrest?

23            A.    Elementary.
```

Page 18

```
 1    But then USDA was giving us three years for
 2    either me to get a degree, or to have
 3    somebody in place.  And they -- that came
 4    about with the reauthorization act, and I
 5    don't remember what that was.  I think in
 6    '05, I think, or '06.
 7         Q.    Okay.  So, would it be correct
 8    to say that for '03/'04 and '04/'05, you
 9    reported directly to Dr. Moffett and
10    Mr. Adams, and mainly Mr. Adams?
11         A.    Yes, sir.
12         Q.    Okay.  And you supervise the
13    employees in all those ten schools that we
14    talked about?
15         A.    The way I understood when I
16    was given the position, is that I would
17    oversee that we -- that the Child Nutrition
18    Program would be compliant with the federal
19    regulations set forth for the National
20    School Lunch and Breakfast Program, and so I
21    did have some responsibilities.
22              We allow -- the principal was
23    the on-site supervisor.  But sometimes,
```

Page 22

```
 1          Q.    And basically, a nonrenewal

 2    acts as a termination; they just might stay

 3    on for the rest of the year; is that

 4    correct?

 5                MS. SMITH:  Object to the form

 6    of the question.  You can go ahead and

 7    answer, if you know.

 8          A.    I'm not sure I understand what

 9    you're asking.

10          Q.    Well, if they're not renewed,

11    they're not going to be there after that

12    year; correct?

13          A.    Correct.

14          Q.    So, effectively they're

15    terminated, but they just stay on until

16    their contract runs out; correct?

17          A.    Yes, sir.

18          Q.    Okay.  Other than

19    Ms. Hutchison, how many times have you

20    participated in and helped make a decision

21    about nonrenewing an employee?

22          A.    Well, I'm probably not going

23    to be able to get it exact.
```

Page 31

```
 1    the decision to nonrenew them was made

 2    towards the end of the year, in the spring.

 3    The decision to nonrenew Ms. Hutchison was

 4    made in November.  So, to me there's a

 5    difference.  And I'm just wondering, does

 6    that happen a lot?

 7                 MS. SMITH:  Object to the form

 8    of the question.

 9         A.    Well, I misunderstood what you

10    were saying.

11         Q.    Okay.

12         A.    We made a formal

13    recommendation in the spring.  But on those

14    particular people, it was probably made

15    before that time.

16         Q.    Okay.

17         A.    No, it was not all of them.

18    We're not just, you know -- I think they

19    send forms out.  And we have a process that

20    we go through, and it's made official, I

21    guess, but -- I'm sorry, I misunderstood

22    that.

23         Q.    Oh, that's fine.  Thank you
```

Page 32

1    for telling me.  If something like that

2    happens, let me know.

3              So, basically, the decision

4    can be made at any time during the year, and

5    the formal process goes -- takes place later

6    at the end of the year?

7         A.    Right.

8         Q.    But the decision might be made

9    back in October, November, whenever?

10        A.    Uh-huh.

11        Q.    And is it generally the policy

12   to inform the employees when the decision is

13   made?

14        A.    No, sir.

15        Q.    Generally --

16        A.    And I -- The personnel

17   director and the principal are the people

18   who inform.  I was not a part of that.

19        Q.    Okay.  So, generally, they're

20   not informed until the formal proceeding

21   goes through, or whatever; is that correct?

22        A.    Correct.

23        Q.    Have you ever known a

Page 42

```
 1        Q.     Were you able to observe her
 2   work in any way?
 3        A.     As much as -- I mean, not
 4   anymore than I observed anybody else's.
 5        Q.     Right.  But you did somewhat
 6   observe her work?
 7        A.     But, you know, usually when we
 8   were on the same people, I mean, I would
 9   just be there briefly, not for a long period
10   of time, except for when I'm doing a review.
11        Q.     From what you observed, was
12   she a good employee?
13        A.     Yes.
14        Q.     Did her job?
15        A.     Yes.
16        Q.     Have you known of any
17   performance problems she had?
18        A.     No.
19        Q.     Let me show you Plaintiff's
20   Exhibit 2, and just ask you, have you ever
21   seen this before?
22        A.     Yes, I have.
23        Q.     And that's a performance
```

Page 52

1    conversation you can remember having with

2    Ms. Densel about Ms. Hutchison?

3         A.    I believe the day that she

4    came in with the finger bleeding.  I mean, I

5    may have asked a general question, how are

6    things going, but I don't think it would

7    have been just Ms. Hutchison.  I would have

8    tried to find out from Brenda if the

9    employees were adjusting to the way she

10   does -- she has a schedule, and the way she

11   does things.

12        Q.    Ms. Densel?

13        A.    Uh-huh.

14        Q.    Let me jump back prior to

15   that.  Prior to Ms. Densel coming, was there

16   an issue about employees taking food out of

17   the kitchen?

18        A.    Yes.

19        Q.    What do you remember about

20   that?

21        A.    Well, that was -- When I

22   became the supervisor of the Child Nutrition

23   Program, one of the things I was made aware

Page 56

```
 1          A.      Right next to hers.
 2          Q.      Okay.  So, do you recall
 3   Ms. Hutchison coming to see you after she
 4   went to see the nurse?
 5          A.      Yes.
 6          Q.      And who was with
 7   Ms. Hutchison?
 8          A.      Brenda Densel.
 9          Q.      Do you know why they came to
10   see you?
11                  MS. SMITH:  Object to the form
12   of the question.
13          A.      I was not sure why they came
14   to see me, but I sat down.  And I don't
15   remember word for word what was said.  I do
16   know that I asked Lynne what happened, and
17   she told me.  And I'm sorry to say I don't
18   remember.
19                  I remember her saying that
20   they snatched something from her hand.  And
21   I believe I asked her if it was on purpose,
22   and I was under the impression that it was
23   not on purpose, but that she thought that
```

Page 57

```
 1    people that she was working with didn't like

 2    her.

 3         Q.      She told you that?

 4         A.      Yes, sir.

 5         Q.      Did she say why they didn't

 6    like her?

 7         A.      I can't remember if at that

 8    point -- I think that she was saying that if

 9    the manager -- We were trying to enforce --

10    Let me back up a little bit.  We were trying

11    to get the people to use recipes.  Using

12    recipes helps you be more accountable for

13    your supplies, your food.  When you use a

14    recipe, you know how much, and so we were

15    trying to enforce the use of recipes.

16                 And she told me that if she

17    would try to use the recipe, that people

18    would tell her she didn't have to do what

19    the supervisor said.  And so, you know, I

20    could understand that -- you know, I said:

21    You have to do what the supervisor says.

22    And I don't remember the words, but in gist,

23    I think that -- I just felt like that she
```

Page 58

1    felt like the people in there didn't, you

2    know, did not like her.

3         Q.    Did she relay to you in any

4    way that she thought they were ganging up on

5    her?

6         A.    No, sir.

7         Q.    She just thought they didn't

8    like her?

9         A.    Yes, sir.

10        Q.    Did she make any comments

11   about her being the only white employee?

12        A.    No, sir.  But her husband did.

13        Q.    Were you aware that she was

14   the only white employee?

15        A.    Yes, sir.  Well, I mean, she

16   was not the only white employee; the manager

17   and assistant manager are both white.

18        Q.    Right.  But as far as the

19   employees under them, she's the only white

20   employee?

21        A.    And let me backtrack.  I don't

22   remember if she said she's the only white

23   employee or not, but I was aware that she

Page 59

```
 1   was the only white worker.
 2          Q.     Right.  That's what I meant.
 3          A.     I don't know if she said it or
 4   not.
 5          Q.     You were aware that she was
 6   the only white employee, other than
 7   Ms. Densel and Ms. Pritchett?
 8          A.     The manager, yes.
 9          Q.     Do you recall if she relayed
10   any comments about comments that they had
11   made to her about white trailer trash, or
12   anything like that?
13          A.     No, sir.
14          Q.     And my understanding is, this
15   meeting was on November 9th, 2004.  Do you
16   remember what time of day this was?
17          A.     It was in the morning.
18          Q.     Do you remember discussing the
19   possibility of her transferring.
20          A.     Yes, sir.  Because I was
21   trying to figure out what she wanted.
22          Q.     Was that a possibility, for
23   her to transfer?
```

Page 60

```
 1          A.      It could be a consideration.

 2          Q.      Did you want to help her?

 3          A.      Yes.

 4          Q.      And what do you recall was

 5    discussed about her transferring?

 6          A.      I just asked her if she wanted

 7    to transfer.  And she told me -- I said:  Do

 8    you want to transfer?  And she said:  No.  I

 9    like working with Ms. Brenda, and the

10    ladies -- and the other ladies.

11          Q.      Anything else you can remember

12    about that?

13          A.      About that comment?

14          Q.      About comments about her

15    transferring?

16          A.      (Witness shakes in a negative

17    response.)

18          Q.      Was anything else done about

19    possibly transferring her?

20          A.      Huh-uh.  I don't remember

21    anything else.

22          Q.      And this was in your office;

23    is that correct?
```

Page 63

1        A.      Yes, sir.

2        Q.      All right.  We now know the

3    conversation, at least part of it, was

4    taped.  Were you aware of that, that it was

5    being taped?

6        A.      No, sir.

7        Q.      Did he show you a tape

8    recorder at any point?

9        A.      At the end.

10        Q.      What do you recall was their

11    purpose in coming to see you at that time?

12        A.       He wanted to speak to the

13    superintendent and myself, or whoever would

14    be over me, and wanted to know -- I'm trying

15    to think how he asked it.  What were we

16    going to do about Lynne being treated -- the

17    hostile treatment she was receiving.  And

18    the only thing I was aware of was the Annie

19    thing, and so I was like:  Hostile

20    treatment?  And he said:  Yes.

21                And he wanted Mr. Adams.  And

22    so, I think I called for Mr. Adams.  And he

23    wasn't in the office, so we talked a little

Page 64

1    more.   He brought up the fact about people

2    stealing twenty-five pounds of sugar.

3              And this is definitely not

4    word for word and may not be in order,

5    but -- And so, I could see kind of where it

6    was going.   He was talking about the people

7    taking things, and then she interjected

8    about following the recipes again.

9         Q.     What do you mean you could see

10   where it was going?

11        A.     Well, I felt like -- I mean,

12   he mentioned at the time that it was

13   one-sided.   That it was -- I can't remember

14   one-sided or whatever he said, insinuating

15   that it was a lot of blacks.   He didn't say

16   blacks, but that's how I took it.   And then

17   he referenced the fact that if it was on the

18   other way around, you know, that I was --

19   that we would be dealing with it

20   differently.

21        Q.     Do you remember him making any

22   comments about the comments some employees

23   had made to her about --

Page 65

```
 1         A.      He never made any.

 2         Q.      You got to let me finish.

 3         A.      All right.

 4         Q.      Do you remember him making any

 5   comments about other employees making

 6   comments to her, calling her white trailer

 7   trash, or anything like that?

 8         A.      He never made those comments.

 9         Q.      He brought up the issue that

10   it was one-sided, and to your understanding,

11   that they were ganging up on her?

12         A.      No, sir.  I understood that

13   that was referring to that we had black

14   employees and one white employee.  I didn't

15   see it as a ganging-up.

16         Q.      But were you aware that he was

17   making an issue of the race, of their race?

18         A.      Right.  And I don't know if

19   this is -- but thinking back, when I went to

20   talk to Lynne about being hired, I had to go

21   to her house because she didn't have a

22   telephone.  And when I asked her if she -- I

23   offered her the job, and I said:  It's at
```

Page 66

1    South Girard.  And she told me:  I'll have

2    to ask my old man about working at South

3    Girard.

4              And I didn't really think that

5    much about it.  But then things start

6    clicking in your head, and when he comes in

7    there and starts making reference to

8    everybody being black but her, so. .

9         Q.    Why does that -- What is that

10   in reference to?  I'm confused.

11        A.    Well, I mean, it's just

12   something that's in the back of your head

13   when you go and talk to somebody about

14   something, and they make a comment:  I don't

15   know if I want to work at South Girard.

16   I've got to talk to my old man, and

17   evidently get his approval to work there.

18        Q.    What does that comment mean to

19   you?

20        A.    Then, I took it to be that it

21   was in a black area.  That school's in a

22   black area, predominantly black area, and he

23   might would have concerns.

FREEDOM COURT REPORTING

```
 1        A.      I don't remember it being
 2   brought up.
 3        Q.      And she's still employed at
 4   Meadowlane?
 5        A.      She's at Meadowlane.
 6        Q.      Is that right?
 7        A.      Yes, sir.
 8        Q.      All right.  So, you had a
 9   meeting with Mr. McCart and Ms. Hutchison,
10   and then you also called in Mr. Adams?
11        A.      Right.
12        Q.      And he came in to your office?
13        A.      Yes, sir.
14        Q.      Okay.  And the conversation
15   continued for a time; is that correct?
16        A.      Yes, sir.
17        Q.      Do you recall Mr. McCart and
18   Ms. Hutchison asking to fill out a formal
19   complaint during this meeting?
20        A.      Do I recall them asking?
21        Q.      Uh-huh.
22        A.      I do not recall them asking,
23   but I do remember Mr. Adams telling them
```

Page 79

1    one with --

2                MR. WILSON:   Yeah.   After the

3    one --

4        Q.     After Mr. McCart and

5    Ms. Hutchison left, did you then that day

6    talk to Mr. Adams about what went on in the

7    meeting?

8        A.     I'm sure we talked about it

9    briefly before he went back into his office,

10   just kind of recapped what we thought was

11   going on.  And I felt like when he came in

12   there, that he dominated the conversation,

13   and she said very little.

14       Q.     Then at that point or that

15   day -- Let me -- Scratch that.

16                Did you and Mr. Adams, or just

17   you, talk to Ms. Densel that day about what

18   went on at that meeting?

19       A.     No.  I think I went to see her

20   the next morning.

21       Q.     All right.  Did anyone go with

22   you the next morning?

23       A.     I don't believe so.

Page 82

```
 1        A.     Uh-huh.

 2        Q.     Did you call anyone else,

 3   Mr. Adams or anyone?

 4        A.     I don't remember calling

 5   Mr. Adams.

 6        Q.     Okay.  Do you remember --

 7        A.     I think we went and talked to

 8   Mr. Sparks.

 9        Q.     Okay.  What do you remember

10   talking to Mr. Sparks about?

11        A.     Telling him what happened in

12   my office.

13        Q.     And at this time, was the

14   decision made to not renew her contract?

15        A.     It was not made definitely,

16   but it was a consideration.  Brenda made

17   that.

18        Q.     What do you mean it was not

19   made definitely?

20        A.     Well, because we hadn't made a

21   formal recommendation.  It was just

22   discussed.

23        Q.     You're talking about a formal
```

Page 83

```
 1    recommendation with the Board?

 2          A.    Yes, sir.

 3          Q.    We talked about this earlier,

 4    but you stated a decision can be made

 5    sometime throughout the year, and then later

 6    you go to the Board to finalize it.  But the

 7    decision can be made at that point; correct?

 8          A.    Right.

 9          Q.    And is that what happened

10    here?

11          A.    Yes, sir.  We discussed it,

12    and Brenda said that she didn't believe she

13    wanted him -- she was afraid for her

14    employees.

15          Q.    Do you know if Brenda had ever

16    met Mr. McCart?

17          A.    I don't know, but I don't

18    believe so.

19          Q.    So, she was basing her fear --

20          A.    -- on what I said.

21          Q.    -- on what you told her?  And

22    what exactly did you tell her about him?

23          A.    I just told her that he was
```

Page 84

```
 1    loud and intimidating.  I mean, I don't

 2    remember word for word what I said.

 3         Q.    And so, based on that, she

 4    made the decision to not renew

 5    Ms. Hutchison's contract?

 6         A.    Uh-huh.

 7         Q.    Was that made in the meeting

 8    that you and her had, or was that when you

 9    met with Mr. Sparks?

10         A.    It was -- Well, she said

11    something to me before we went to

12    Mr. Sparks.

13         Q.    Okay.

14         A.    That was the decision made

15    before we went to see Mr. Sparks.  But I

16    wanted him to be aware of what we were. . .

17         Q.    Did you bring it up to

18    Mr. Sparks in that meeting?

19         A.    I don't remember if we did.  I

20    feel like we did, but I don't remember for

21    sure.

22         Q.    You don't remember

23    specifically discussing that with
```

Page 87

```
 1          Q.     Okay.  Do you know if anyone

 2   ever came to you in May when the final

 3   determination, the final approval was given?

 4          A.     I don't remember.

 5          Q.     Do you remember anyone,

 6   Mr. Adams coming to you to discuss that?

 7          A.     He may have called me and

 8   said -- I don't remember if Mr. Sparks or

 9   Mr. Adams, they may have called me and asked

10   me if this was our final decision.

11          Q.     Did you ever discuss that with

12   Dr. DiChiara?

13          A.     No, sir.

14                      (Plaintiff's Exhibit 15

15                       was marked for

16                       identification purposes.)

17          Q.     I'm going to mark this as

18   Plaintiff's Exhibit 15.  And this is a

19   transcript that we had made of the recording

20   of the meeting, first of all, with

21   Mr. McCart, Ms. Hutchison and you, and then

22   later Mr. Adams joined in.

23          A.     Yes, sir.
```

Page 88

1        Q.      It's nine pages.  And I'll

2    ask -- I think you've already told me,

3    though, that you've seen that document; is

4    that correct?

5        A.      Yes, sir.

6        Q.      And you saw it preparing for

7    this deposition?

8        A.      I believe I saw it yesterday

9    evening.

10       Q.      Did you look at it today also?

11       A.      Very little, today.

12       Q.      Okay.  I'm going to try and go

13   over some of this, just to get you to tell

14   me what you remember about this.

15       A.      Okay.

16       Q.      On the second page, his name

17   is listed as McCarthy, but I think it's

18   obvious, though, he spoke to McCart.  Third

19   paragraph, I guess would you say, is his

20   comments, stating:  She needs to fill out a

21   formal complaint about the hostile treatment

22   she's been getting over there for the last

23   couple of months.  Do you remember him

```
 1    making that statement about hostile

 2    treatment?

 3         A.    I do.

 4         Q.    And do you know who he was

 5    referring to regarding hostile treatment?

 6         A.    I assumed he was referring to

 7    Annie.

 8         Q.    He says it's been going on for

 9    the last couple of months.  Do you remember

10    him discussing that?

11         A.    I remember him saying the

12    hostile treatment.  I do not remember the

13    rest of it.  Because when he said hostile

14    treatment, I was a little bit surprised.

15         Q.    And then, I guess that's kind

16    of your surprise.  She says it was hostile

17    treatment.  And then he refers to cutting

18    her finger, then he refers to a kind of

19    one-sided population over there.

20         A.    Uh-huh.

21         Q.    And they're mistreating her.

22    Is it your belief that he's referring to the

23    black employees over there when he makes
```

1    that comment?

2        A.    Well, at that point, that's

3    the only other -- he didn't say it was the

4    manager and the assistant manager.

5        Q.    But is it your

6    understanding -- I mean, is it your

7    recollection that he was referring to the

8    black employees over there when he refers to

9    the one-sided population?

10       A.    Yes, sir.

11       Q.    And then, there's your

12   response.  And again, he says:  She needs to

13   go ahead and fill out a formal complaint,

14   too.  So, that's two times he's stated that

15   she needs to fill out a formal complaint.

16       A.    Okay.

17       Q.    Do you know why that she was

18   not given any type of complaint to fill out?

19       A.    She was instructed by

20   Mr. Adams to write in detail her complaint.

21   We don't have a form.

22       Q.    Okay.  Your response down

23   here -- Let's see.  The fourth paragraph

```
 1    but I do know that I asked --
 2            Q.    Okay.  You don't recall a
 3    specific place?
 4            A.    Huh-uh.  Because I couldn't
 5    have known a specific place at that time,
 6    you know, a specific place at that point.
 7            Q.    Okay.  I'm going to -- on page
 8    three.
 9            A.    Yes, sir.
10            Q.    The eighth line from the
11    bottom, a comment by you says:  Oh, I know.
12    And I can't go over there and spank them or
13    anything like that?
14            A.    Right.
15            Q.    You could have gone over there
16    and investigated or disciplined them, if you
17    wanted to, though:  Correct?
18            A.    I would go over there and
19    listen to -- I would have to get -- I would
20    investigate exactly -- And we were waiting
21    for, you know, her to write down exactly her
22    complaint.
23            Q.    But you didn't go over there
```

Page 93

1    and investigate, did you?

2          A.      (Witness shakes in a negative

3    response.)

4          Q.      Is that a no?

5          A.      I mean, I went over there and

6    asked -- I don't remember if I asked -- I

7    mean, I'm sure I would have said to Brenda,

8    was she aware of anybody being mean to her

9    or something.  But I didn't go and ask the

10   employees, no.

11         Q.      You didn't go over and speak

12   to any employee over there?

13         A.      Huh-uh.

14         Q.      Because the decision to

15   nonrenew her was made the next morning;

16   correct?

17                 MS. SMITH:  Object to the form

18   of the question.

19         Q.      That's correct?

20         A.      The decision was made the next

21   morning?  Yeah, by Brenda.

22         Q.      And do you know if Brenda

23   talked to any of the employees about this

Page 96

1    activity?

2           A.      I went to get him.  He wasn't

3    in the office, and I couldn't get him on the

4    phone, so I went over to that other

5    building.  And on the way back over there, I

6    briefed him that Mr. McCart was insinuating

7    it was racial.

8           Q.      Okay.  So, there was a time

9    period when where they came in to meet with

10   you.  And you couldn't get Mr. Adams on the

11   phone, so you walked over there, and you and

12   him walked back?

13          A.      Right.

14          Q.      And you kind of filled him in

15   on what was going on?

16          A.      Uh-huh.

17          Q.      At that point, you informed

18   him that there was some allegations of

19   racial activity?

20          A.      Right.

21          Q.      But nothing was done to

22   investigate any allegations of racial

23   activity; correct?

Page 97

1           MS. SMITH:  I object to the

2    form of the question.

3           Q.    Is that correct?

4           A.    Correct.

5           Q.    Earlier, when I asked you

6    about retaliation, you said that even

7    regardless of the merits of the allegations

8    or complaint, that those matters should be

9    investigated.  Do you remember that?

10          A.    (Witness nods head in the

11   affirmative.)

12          Q.    Is that yes?

13          A.    Yes, sir.

14          Q.    Okay.  But that wasn't done in

15   this case; correct?

16          A.    No, sir.

17          Q.    And again, third paragraph

18   from the bottom it says:  No.  I mean, I

19   don't see it when I'm over there.  I just

20   know she's mentioned it.  She has mentioned

21   it.  Is that referring to the racial

22   activity?

23          A.    No, sir.  And I don't remember

# Densel Deposition

Page 2

```
 1              IT IS FURTHER STIPULATED AND

 2   AGREED that the signature to and the reading

 3   of the deposition by the witness is not

 4   waived, the deposition to have the same

 5   force and effect as if full compliance had

 6   been had with all laws and rules of Court

 7   relating to the taking of depositions.

 8              IT IS FURTHER STIPULATED AND

 9   AGREED that it shall not be necessary for

10   any objections to be made by counsel to any

11   questions except as to form or leading

12   questions, and that counsel for the parties

13   may make objections and assign grounds at

14   the time of the trial, or at the time said

15   deposition is offered in evidence, or prior

16   thereto.

17              IT IS FURTHER STIPULATED AND

18   AGREED that the notice of filing of the

19   deposition by the Commissioner is waived.

20

21              * * * * * * * * * * * * *

22

23
```

FREEDOM COURT REPORTING

```
 1            * * * * * * * * * * * *

 2                    I N D E X

 3                  EXAMINATION

 4                                    PAGE

 5   By Mr. Wilson ..................... 7

 6   By Ms. Smith ..................... 67

 7            EXAMINATION CONTINUED

 8                                    PAGE

 9   By Mr. Wilson .................... 69

10            PLAINTIFF'S EXHIBITS

11                                    PAGE

12   Ex. 1 - Notice of deposition ....... 22

13   Ex. 2 - Ms. Hutchison's job

14            evaluation .............. 23

15   Ex. 3 - Nurse's report on

16            Ms. Hutchison ........... 35

17   Ex. 4 - Position Statement of

18            Board ................... 42

19   Ex. 5 - Ms. Hutchison's earlier

20            evaluation report ........ 44

21   Ex. 6 - Complaints and grievances

22            policies ................ 57

23   Ex. 7 - List of documents (like
```

Page 4

1              sexual harassment...) .... 58

2    Ex. 8 - List of job duties ........ 70

3            *  *  *  *  *  *  *  *  *  *  *  *  *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 5

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3              EASTERN DIVISION

4

5   CASE NUMBER:  CV-06-00700-WHA

6   ELIZABETH LYNNE HUTCHISON,

7            Plaintiff,

8            vs.

9   PHENIX CITY BOARD OF EDUCATION, ET AL.,

10            Defendants.

11

12  BEFORE:

13            SARA MAHLER, Commissioner.

14  APPEARANCES:

15            JOSHUA D. WILSON, ESQUIRE, of

16  WIGGINS, CHILDS, QUINN & PANTAZIS, 301 19th

17  Street North, Birmingham, Alabama 35203,

18  appearing on behalf of the Plaintiff.

19            SYDNEY S. SMITH, ESQUIRE, of SMITH

20  & SMITH, 1503 Broad Street, Phenix City,

21  Alabama 36867, appearing on behalf of the

22  Defendants.

23

Page 6

```
 1   APPEARANCES (cont.)

 2             ALSO PRESENT:  ELIZABETH HUTCHISON

 3                            LARRY DICHIARA

 4                  *  *  *  *  *  *

 5

 6             I, SARA MAHLER, CSR, a Court

 7   Reporter of Wetumpka, Alabama, acting as

 8   Commissioner, certify that on this date, as

 9   provided by the Federal Rules of Civil

10   Procedure and the foregoing stipulation of

11   counsel, there came before me at the offices

12   of Raymond Jackson, 2505 Crawford Road,

13   Phenix City, Alabama 36867, beginning at

14   9:00 a.m., Brenda Densel, witness in the

15   above cause, for oral examination, whereupon

16   the following proceedings were had:

17                  BRENDA DENSEL,

18   being first duly sworn, was examined and

19   testified as follows:

20             COURT REPORTER:  Usual

21   stipulations?

22             MS. SMITH:  Yes.  And we would

23   like to read and sign.
```

FREEDOM COURT REPORTING

Page 7

1           MR. WILSON:  That's fine.

2                 EXAMINATION

3    BY MR. WILSON:

4           Q.    Ms. Densel, good morning.  My

5    name is Josh Wilson.  We met briefly

6    outside.  How are you today?

7           A.    I'm fine.  How are you?

8           Q.    Have you ever given a

9    deposition before?

10          A.    No, sir, I haven't.

11          Q.    Okay.  I'm going to go over a

12   couple of ground rules.  First of all, when

13   I ask a question, if you'll just let me

14   finish my question before you answer.  Is

15   that okay?

16          A.    Yes, sir.

17          Q.    Second is, when you answer a

18   question, if you'll speak out loud, yes or

19   no, without nodding your head.  A lot of

20   times you might know the answer to a

21   question before I finish and you might want

22   to jump in, but if you'll just wait and let

23   me finish, I would appreciate it.  Okay?

Page 8

```
 1        A.      Okay.

 2        Q.      If you don't understand a

 3   question I ask, please tell me to repeat it,

 4   rephrase it, whatever, and I'll try to make

 5   sure you understand it.  Okay?

 6        A.      Okay.

 7        Q.      If you do answer my question,

 8   I'll assume that you understood it.  Is that

 9   okay?

10        A.      That's fine.

11        Q.      Okay.  Will you tell me your

12   full name.

13        A.      Brenda Densel.

14        Q.      Do you have a maiden name,

15   middle name?

16        A.      Yes.  My maiden name is

17   Archie.

18        Q.      Okay.  How do you spell that?

19        A.      A-R-C-H-I-E.

20        Q.      Okay.  And what's your current

21   position with the Phenix City Board of

22   Education?

23        A.      I'm the CNP manager at South
```

Page 9

```
 1    Girard Junior High School.

 2          Q.     How long have you been in that

 3    position?

 4          A.     I'm been at South Girard this

 5    is my third year.

 6          Q.     So, did you start in 2004?

 7          A.     Yes, sir.  I transferred from

 8    Ridgecrest Elementary to South Girard in the

 9    school year 2004.

10          Q.     Where is Ridgecrest?

11          A.     It's located off of 431.

12          Q.     It's part of the Phenix

13    City --

14          A.     Yes.  It is part of the Phenix

15    City public school system, yes, sir.

16          Q.     Okay.  And did you transfer at

17    the beginning of the 2004 school year?

18          A.     Yes, sir.  Uh-huh.

19          Q.     And that was through the 2005

20    school year, is your first year?

21          A.     Yes, sir.

22          Q.     If you'll just let me finish.

23          A.     Sorry.
```

FREEDOM COURT REPORTING

Page 10

1      Q.     That's okay.  It happens a

2   lot.  Okay.  Let me just back up some more.

3             Before, prior to you being at

4   Ridgecrest, where were you before that?

5      A.     I was assistant manager at

6   Central High School.

7      Q.     How long were you at

8   Ridgecrest?

9      A.     Three years.

10     Q.     And you were assistant manager

11  at what school?

12     A.     Central High School.

13     Q.     Okay.  How long were you

14  there?

15     A.     I started in '95 at Central

16  High School.

17     Q.     And did you work anywhere with

18  the Board of Education before that?

19     A.     Yes, sir.

20     Q.     Where was that?

21     A.     I started actually in 1983,

22  worked until '85.  I had my last daughter.

23  I came back in 1989, and worked until 1993.

Page 11

```
 1        Q.     Where did you work from '83 to

 2   '85?

 3        A.     I worked for the Phenix City

 4   Middle School.

 5        Q.     And from '89 to '93 -- I mean,

 6   '93?

 7        A.     It was still considered Phenix

 8   City Middle School, the old Central High

 9   School on South Railroad Street in Phenix

10   City.

11        Q.     Okay.  And are all of these

12   positions, were they -- were you involved in

13   the food service part?

14        A.     Yes, sir.

15        Q.     What's your education level?

16        A.     I completed just a high school

17   education.  I graduated from Central High

18   School in 1975.

19        Q.     And are you married?

20        A.     Yes.

21        Q.     What's your husband's name?

22        A.     Billy Joe Densel.

23        Q.     How long have you been
```

Page 22

1    satisfactory, except for one that needed

2    improvement.

3            Q.    Was she a good employee?

4            A.    Yes, sir.

5            Q.    Did you have any problems with

6    her?

7            A.    No, sir.

8            Q.    Did she always do her job?

9            A.    Yes, sir.

10           Q.    Follow the directions?

11           A.    Yes, sir.

12           Q.    I'm going to mark this as

13    Plaintiff's Exhibit 1, and just ask you if

14    you've ever seen this before?

15                        (Plaintiff's Exhibit 1 was

16                         marked for identification

17                         purposes.)

18           A.    Yes, sir.

19           Q.    Okay.  And did you bring any

20    documents with you, or anything?

21           A.    Yes.  The same.

22           Q.    Oh, you brought that.  You

23    received a copy of it?

FREEDOM COURT REPORTING

Page 27

1          Q.     Do you recall an incident

2     where Ms. Hutchison cut her hand?

3          A.     Yes, sir.

4          Q.     Okay.  Do you remember what

5     time period that was?

6          A.     It was in the morning.

7          Q.     Okay.  Well, what about what

8     time of year?

9          A.     It was in the fall.

10          Q.     Around early November,

11     November 9th, 2004, does that sound right?

12          A.     Yes, sir.

13          Q.     Tell me what you remember

14     about that incident.

15          A.     I was in my office working.

16     Lynne had come in there, and I stopped what

17     I was doing, and I looked up, and I could

18     see that her finger was bleeding.  And I

19     said:  Oh, Lynne, what have you done?  And

20     she said:  Ms. Annie snatched the clear wrap

21     out of my hand.  I said:  Ms. Annie?  And

22     she said:  Yes.  I said:  Okay.

23                    And I applied a Band-Aid to

Page 28

1    it.  And Lynne was upset and crying.  And

2    so, we did not have a school nurse on site

3    there, so I took her downtown to the school

4    nurse.

5         Q.    Okay.  Did she tell you

6    anything about why Annie had snatched

7    something from her?

8         A.    No, sir.

9         Q.    Do you know if she appeared

10   angry about the incident?

11        A.    No, sir.

12        Q.    And then, did you leave her

13   down there with the nurse, or did she --

14   what happened after that?

15        A.    Me and Lynne left.  Lynne rode

16   with me, and I took her downtown to Sandra

17   Gentry, which was the school nurse.  And

18   Ms. Gentry looked at her finger.

19        Q.    Okay.  And then, did you go

20   back to your office?

21        A.    Oh, no, sir.  We talked to

22   Ms. Passmore, which was the supervisor.

23        Q.    What's Ms. Passmore's

```
 1   position?

 2          A.      She's the supervisor.

 3          Q.      Supervisor of?

 4          A.      Food, child nutrition.

 5          Q.      Over South Girard, or?

 6          A.      Over all the schools.  All the

 7   CNP.

 8          Q.      Okay.  Where's her office

 9   located?

10          A.      Downtown.

11          Q.      Is it located at one of the

12   schools?

13          A.      No, sir.  It's downtown in the

14   auxiliary building next to the Phenix City

15   Board of Education.

16          Q.      And just to make sure I've got

17   it straight, you left from South Girard,

18   went to --

19          A.      -- the auxiliary service

20   building where Ms. Passmore's office is, and

21   the nurse's office is.

22          Q.      Okay.  They're in the same

23   office there?
```

Page 31

1         Q.     And I believe later this same

2    day, Ms. Hutchison and her husband,

3    Mr. McCart, went to meet with Ms. Passmore.

4    Were you aware of that?

5         A.     Not until the next day.

6         Q.     Okay.  How'd you become aware

7    of that the next day?

8         A.     Ms. Passmore came up to my

9    office.

10         Q.     And what did Ms. Passmore say?

11         A.     She had told me that

12    Mr. Hutchison and Ms. Hutchison had come

13    back downtown yesterday -- I mean, the day

14    before that afternoon, and said that

15    Mr. Hutchison was very upset, and was saying

16    all kinds of things.  I don't remember

17    exactly what was said.  And that was it.

18         Q.     At that point, did she

19    indicate that they were upset about some

20    problems that were going on with other

21    employees?

22         A.     She did, but I don't remember

23    what all was said.

Page 33

```
 1    is Mr. McCart.

 2           A.     Yes.  Mr. McCart.

 3           Q.     Is that who you're referring

 4    to?

 5           A.     Yes, Mr. McCart.

 6           Q.     Okay.  Had you ever met

 7    Mr. McCart at that point in time?

 8           A.     No, sir.

 9           Q.     So, you're basis on that was

10    from what Ms. Passmore told you?

11           A.     Yes, sir.

12           Q.     Can you remember more

13    specifically what Ms. Passmore told you to

14    cause you to think that maybe there could be

15    some type of danger?

16           A.     She just said that he was

17    upset and raising his voice, and that she

18    had went and got Mr. Adams, our personnel

19    director, to come over there.

20           Q.     Anything else, other than him

21    raising his voice, that caused you concern?

22           A.     No, sir.  Just him being very

23    upset, and the raising of his voice, and
```

```
 1    saying things.  I don't remember what all

 2    was said, and what Ms. Passmore had told me.

 3         Q.    So, after the meeting you had

 4    with Ms. Passmore, you went -- the both of

 5    you went to speak with Mr. Sparks?

 6         A.    Yes, sir.

 7         Q.    Where is Mr. Spark's office?

 8         A.    It was located in the front of

 9    the building.

10         Q.    In the front of what building?

11         A.    South Girard Junior High

12    School.

13         Q.    Let me try to get my bearings

14    straight a little bit.  The auxiliary

15    building, how far away is that from South

16    Girard?

17         A.    A mile, maybe.

18         Q.    Okay.  So, I guess you'd have

19    to drive --

20         A.    Yes, sir.

21         Q.     -- to get from one place to

22    the other?  If you will answer again.

23         A.    Yes, sir.
```

Page 35

```
 1        Q.     And you met with -- Okay.  Let

 2   me back up.  Ms. Passmore came to your

 3   office that next day, after she had a

 4   meeting with Ms. Hutchison and Mr. McCart;

 5   is that right?

 6        A.     Yes, sir.

 7        Q.     She came to see you?

 8        A.     Yes, sir.

 9        Q.     Okay.  And then, from that

10   point, the two of you decide let's go see

11   Mr. Sparks?

12        A.     Yes, sir.

13        Q.     What were you going to talk to

14   Mr. Sparks about?

15        A.     I just told him what

16   Ms. Passmore had come out there and told me.

17   And then, Ms. Passmore proceeded to tell him

18   what took place downtown.

19        Q.     I'm going to mark this as

20   Plaintiff's Exhibit 3.  It had been marked

21   as Defendant's Exhibit 7 in Ms. Hutchison's

22   deposition, I believe.

23                    (Plaintiff's Exhibit 3 was
```

FREEDOM COURT REPORTING

1   10th, 2004?

2          A.      Yes, sir.

3          Q.      And what time of day is it

4   that -- first of all, that you and

5   Ms. Passmore met?

6          A.      The next day?

7          Q.      Uh-huh.

8          A.      It was in the morning time.  I

9   don't remember the exact time.

10         Q.      Okay.  And did you immediately

11  after that meeting go see Mr. Sparks?

12         A.      Yes, sir.

13         Q.      What was discussed in this

14  meeting with Mr. Sparks?

15         A.      That Ms. Passmore -- what she

16  had come up there and told me had took place

17  downtown the afternoon before.  And

18  Ms. Passmore told Mr. Sparks what went on

19  downtown.

20         Q.      Can you remember any more

21  specifics about what she said to Mr. Sparks?

22         A.      I don't remember.

23         Q.      Do you remember if Mr. Sparks

Page 38

 1    asked you any questions?

 2          A.     I don't remember Mr. Sparks

 3    really directing any questions to me.

 4          Q.     Do you remember whether -- who

 5    was doing most of the talking?  Was it

 6    Ms. Passmore, or was it you?

 7          A.     Ms. Passmore.

 8          Q.     Okay.  And so, was the meeting

 9    mainly about Ms. Hutchison and Mr. McCart

10    coming to talk to Ms. Passmore and Mr. Adams

11    the day before?

12          A.     Yes, sir.

13          Q.     Do you remember if Mr. Sparks

14    asked you any questions about what type of

15    employee Ms. Hutchison was?

16          A.     I don't remember.

17          Q.     Well, do you remember if

18    Ms. Passmore asked you any questions like

19    that?

20          A.     I don't remember.

21          Q.     Did Ms. Passmore know

22    Ms. Hutchison?

23          A.     Yes, sir.

Page 46

1      A.     I don't know if that was

2    brought up at that time or not.

3      Q.     Let me get you to look at this

4    Plaintiff's Exhibit 5 again -- No.  I'm

5    sorry, 4.  And if you'll turn to page four.

6    The second paragraph there says:  On or

7    about that same day, and I believe we're

8    talking about the day of the meeting with

9    Mr. Sparks, it says:  Ms. Passmore and

10   Ms. Densel went to the principal of South

11   Girard, Reggie Sparks, a black male, and

12   informed him of the facts of the incident.

13            During that conversation,

14   Ms. Densel told Mr. Sparks that unless you

15   don't agree with me, I'm going to recommend

16   that Ms. Hutchison be nonrenewed for the

17   next school year.  Mr. Sparks and

18   Ms. Passmore both agreed with Mr. Densel

19   about the future nonrenewal.  Does that

20   refresh your memory a little bit?

21      A.     It could have, yes, sir.  I

22   guess I did say that.  I just did not

23   remember when that come up.

Page 47

```
 1          Q.    Okay.  So, what was the reason

 2    you gave for wanting to nonrenew

 3    Ms. Hutchison?

 4          A.    Safety reasons.

 5          Q.    Based on Mr. McCart?

 6          A.    Yes, sir.

 7          Q.    And based on what Ms. Passmore

 8    told you about Mr. McCart?

 9          A.    Yes, sir.

10          Q.    Because you had never met him;

11    is that correct?

12          A.    No, sir, I have not met him.

13          Q.    Okay.  Do you remember

14    anything else about that conversation about

15    the decision to not renew Ms. Hutchison?

16          A.    I really don't.

17          Q.    Okay.  Had you ever given a

18    recommendation to nonrenew any other

19    employees?

20          A.    No, sir.

21          Q.    Have you since then?

22          A.    No, sir.

23          Q.    Do you remember if anyone else
```

Page 47

```
 1          Q.     Okay.  So, what was the reason
 2   you gave for wanting to nonrenew
 3   Ms. Hutchison?
 4          A.     Safety reasons.
 5          Q.     Based on Mr. McCart?
 6          A.     Yes, sir.
 7          Q.     And based on what Ms. Passmore
 8   told you about Mr. McCart?
 9          A.     Yes, sir.
10          Q.     Because you had never met him;
11   is that correct?
12          A.     No, sir, I have not met him.
13          Q.     Okay.  Do you remember
14   anything else about that conversation about
15   the decision to not renew Ms. Hutchison?
16          A.     I really don't.
17          Q.     Okay.  Had you ever given a
18   recommendation to nonrenew any other
19   employees?
20          A.     No, sir.
21          Q.     Have you since then?
22          A.     No, sir.
23          Q.     Do you remember if anyone else
```

Page 48

1    came and talked to you about the decision to

2    nonrenew Ms. Hutchison?

3         A.    No, sir.  Not that I can

4    recall.

5         Q.    Do you remember filling out

6    any forms or anything about nonrenewing

7    Ms. Hutchison?

8         A.    No, sir.

9         Q.    Okay.  If you will, look back

10   at that evaluation that you signed, which is

11   Plaintiff's Exhibit 2, which is dated April

12   25th of 2005.

13              And from what we know, the

14   decision to nonrenew her was made back in

15   November of 2004.  Do you know why you would

16   still go through an evaluation process if

17   you know she's not going to be there?

18        A.    This was just something that

19   we do.  We do an evaluation anyway.  And she

20   was still employed with the Phenix City

21   Board of Education, and so I done an

22   evaluation.

23        Q.    Okay.  But starting from that

Page 49

```
 1    November 10th, 2004, meeting to the rest of
 2    the year, you knew Ms. Hutchison was not
 3    going to be employed there next year; is
 4    that correct?
 5           A.     Yes, sir.
 6           Q.     And do you know if she was
 7    told that?
 8           A.     I wasn't there when she was
 9    told.
10           Q.     Do you know when she was told?
11           A.     No, sir.  I do not know the
12    date she was told.
13           Q.     Do you know if she was told
14    after this November 2004 meeting, or did
15    they wait until May, at the end of the
16    school year?
17           A.     It would have been toward May.
18           Q.     Do you know if that's
19    generally how it's done at the Phenix City
20    Board of Education; that if someone -- if a
21    decision's made to nonrenew someone, that
22    they wait until the end of the school year
23    to inform them?
```

Page 60

```
 1        Q.     And just to be sure, you

 2   don't, even around the time of her

 3   evaluation in April, you don't remember

 4   having any discussions with her about a

 5   possible transfer?

 6        A.     No, sir, I don't.

 7        Q.     But the decision had already

 8   been made to nonrenew her, so that wouldn't

 9   have been a possibility anyway?

10        A.     No, sir, it would not have

11   been a possibility.

12        Q.     Okay.  Do you know if it was

13   possible to change that decision at that

14   point in time?

15        A.     Most of the time when we make

16   the decision, that's the decision that we go

17   with.

18        Q.     So, it's effectively a

19   termination?

20        A.     Yes.

21        Q.     Have you ever transferred

22   anyone else?

23        A.     No, sir.
```

# DiChara Deposition

Page 25

```
 1              MS. SMITH:    '05.  Not exactly
 2    on Thanksgiving day.
 3         A.     It was before Thanksgiving
 4    break.  It was the Tuesday before
 5    Thanksgiving on Thursday.
 6         Q.     Okay.  You told me about your
 7    responsibilities as far as hiring.  Let's
 8    talk about nonrenewals and terminations.
 9    What is your responsibility as far as
10    nonrenewals go?
11         A.     I make the final
12    recommendation, of course, to the board, the
13    official recommendation.  But if you want to
14    know how the process typically works, I
15    don't make a recommendation to the Board,
16    unless that recommendation comes from my
17    personnel director, and the personnel
18    director has done their homework by meeting
19    with the department heads and the school
20    principles before making that recommendation
21    to me.
22         Q.     So, generally, you rely on his
23    recommendation?
```

Page 26

1       A.      Absolutely.

2       Q.      Have you ever disagreed with

3   either of your personnel directors on any

4   decisions they've made, or recommendations

5   they've made?

6       A.      I have questioned them, but

7   have never overruled them.

8       Q.      Okay.

9       A.      I may just need some

10  additional information.  Sometimes, they've

11  made recommendations to me that I may say is

12  like, wow, I didn't realize there was a

13  problem with this particular teacher.  And

14  once they give me more information, then I

15  say, you know, I trust your judgment.

16      Q.      Do you ever go out and

17  investigate, for lack of a better word,

18  yourself, to find out anymore of what's

19  going on?

20      A.      No.  Part of the reason I

21  don't is because I know that the personnel

22  directors, either whether it's Mr. East or

23  whether it's Mr. Adams, did not just make

FREEDOM COURT REPORTING

1    officially granted your tenure.

2         Q.    Okay.  If you'll turn to page

3    in Exhibit H, at the bottom, that's titled

4    Equal Opportunity Employment.  To your

5    knowledge, what is this policy in regards

6    to?

7         A.    Well, obviously, it addresses

8    employment, and that there be no one

9    discriminated, based on all of those things

10   listed there; retention, promotion,

11   transfer, and dismissal, and so forth.

12        Q.    Okay.  And there's nothing in

13   here about retaliation, is there?

14        A.    That's correct.

15        Q.    All right.  In the second

16   paragraph here, the superintendent and/or

17   his representative shall investigate all

18   complaints, which may be brought against any

19   individual school in the school district, in

20   regard to any alleged discriminatory action

21   for appropriate treatment by the Board.

22        A.    That's correct.

23        Q.    What is that policy designed

Page 42

```
 1   for?
 2          A.     So that if someone feels like
 3   they're being discriminated against in some
 4   way, that the school system will make an
 5   effort to investigate it.
 6          Q.     Okay.  And is it the -- Whose
 7   duty is it to bring to your attention a
 8   complaint?
 9          A.     Typically, the employee.
10          Q.     Okay.  If an employee
11   complains to their supervisor, is that
12   supervisor obligated to bring that to your
13   attention?
14          A.     No, they're not.  They're
15   obligated to attempt to resolve the issue,
16   and that's why there's a grievance procedure
17   in place; so that if the employee is not
18   satisfied with the effort that's made by the
19   immediate supervisor, there are additional
20   steps in place for them to follow.
21          Q.     Okay.  And it says the
22   superintendent and/or his representative,
23   who is it referring to, his representative?
```

Page 43

1          A.      It could be the principal.  It

2    could be the department heads.  It could be

3    the assistant superintendent.  It could be

4    the grievance officer.

5          Q.      Okay.  So, if a complaint's

6    brought to them, then they do have a duty to

7    investigate that complaint?

8          A.      I would say so.

9          Q.      The next page, Exhibit I,

10   discusses transfers.  Have you seen this

11   document before?

12         A.      Yes, I have.

13         Q.      Are transfers common, and I

14   know it's difficult to answer when I ask a

15   question like that.  But in your idea -- or

16   in your mind, are transfers common in the

17   school district?

18         A.      Yeah.  I mean, we transfer

19   individuals both voluntary and involuntary

20   for a variety of reasons.  And since I've

21   been here, we make transfers throughout the

22   school year, as well as at the end of the

23   school year, in preparation for the next

Page 48

1          A.      Well, I knew that she was one

2     of the people that we had recommended for

3     nonrenewal, but I had never met her before.

4          Q.      Okay.  You knew her name had

5     come up in the nonrenewal process?

6          A.      That's correct.

7          Q.      Did you have any meetings

8     discussing her during the nonrenewal

9     process?

10          A.      No.  Just the list that came

11     to me from the personnel director.

12          Q.      And would that be Mr. Adams?

13          A.      That would be Mr. Adams.

14          Q.      So, you got a list from

15     Mr. Adams of people who were going to be

16     nonrenewed?

17          A.      That he's recommending.

18          Q.      Okay.

19          A.      And a list of people who he's

20     recommending for tenure, and so forth.

21          Q.      Okay.  Did you do anything to

22     find out why Ms. Hutchison was being

23     nonrenewed?

Page 49

1          A.      No, I did not.

2          Q.      Her name was just listed on

3    the sheet and you agreed with that?

4          A.      That's correct.

5          Q.      Okay.  So, your participation

6    in regards to the decision to nonrenew

7    Ms. Hutchison was completely based on

8    Mr. Adams decision?

9          A.      Absolutely.  The

10   recommendation that came from him.

11         Q.      Okay.  Mr. Adams never

12   discussed with you anything about any

13   problems Ms. Hutchison had had prior to that

14   notice you received?

15         A.      Never.

16         Q.      Do you know Ms. Densel?

17         A.      I had never ever talked with

18   Ms. Densel until this school year.  I mean,

19   I knew she was a manager, but just by name

20   only.  I had never actually had a

21   conversation with her.

22         Q.      And she never discussed

23   anything with you about Ms. Hutchison?

Page 53

```
 1    sure that if what he was telling me was true

 2    about food being stolen out of the back, I

 3    wanted to know if that was true and what

 4    procedures do we have in place to prevent

 5    it.

 6         Q.      And what did Ms. Adams tell

 7    about you the reasons -- I'm sorry,

 8    Ms. Passmore, what did she tell you about

 9    the reasons Ms. Hutchison was let go?

10         A.      It was -- She told me about, a

11    little bit about the cut finger, and the way

12    that her husband had behaved at that

13    particular meeting.  She talked about, I

14    think the word she used that he was quite

15    intimidating, and it scared her, and that he

16    hung around the school a lot, assuming to

17    pick up his wife after work, but was a daily

18    presence for the most part.

19              And then, the other thing was

20    that there just seemed to be just some

21    ying-yang taking place among the ladies, and

22    that she just said that they felt like that

23    wasn't always that way.  It had not always
```

Page 54

1    been that way, where there just seemed to be

2    something that Brenda was either trying to

3    find out from Ms. Hutchison or, you know,

4    what's bothering you, that kind of a thing;

5    that there always seemed to be something

6    happening under her breath.  And that they

7    just felt like by nonrenewing her, that that

8    source of that friction, or whatever, would

9    go away; that and the safety issue.

10         Q.    And what do you mean by the

11   source of the friction between the

12   employees?

13         A.    Well, they felt like it wasn't

14   there among the employees prior to

15   Ms. Hutchison.  And they felt like that she

16   was a good worker, but that -- I guess an

17   expression that -- they didn't say this, but

18   an expression that I've always used, is that

19   there was just junk always going on between

20   employees.  And that they felt like she was

21   part of the source of that.

22         Q.    All right.  Do you have any

23   knowledge as to whether any of the other

Page 60

1    to nonrenew her at that time?

2         A.    Not at all.

3         Q.    He didn't say that to you?

4         A.    Never.

5         Q.    Did he say anything to you

6    about why nonrenewing Ms. Hutchison would

7    solve the problem with Mr. McCart?

8         A.    No.  I mean, again, at the

9    time, the recommendation he made to me was a

10   list of names.  And I turned around and made

11   that recommendation to the Board.  So I

12   didn't get any explanation about any of the

13   nonrenewals that year until after this

14   meeting when I went back and talked.

15        Q.    And that's what I'm talking

16   about.  I'm talking about the meeting that

17   you had after.

18        A.    So ask that again.

19        Q.    Okay.  Did he say anything to

20   you about why nonrenewing Ms. Hutchison

21   would solve the problem with Mr. McCart?

22        A.    No.  I simply asked him, give

23   me the details as to why she was recommended

Page 61

1    for nonrenewal, and he shared what

2    Ms. Passmore had shared.  And that was the

3    safety issue, and the general junk that was

4    happening between the employees.  And they

5    felt like she was primarily part of the

6    source.  And so, therefore that would help

7    resolve a lot of the problems.

8         Q.    Okay.  So, in general, was it

9    your opinion that he was saying it's just

10   easier to nonrenew her than to deal with

11   those issues?

12             MS. SMITH:  Object to the form

13   of the question.

14        A.    No, I don't think so.  You

15   know, again, Mr. Adams has been in

16   education -- had been in education about

17   thirty-three years, and I've been there

18   twenty-seven years.  And let's take an

19   example of a football coach.  We have

20   football coaches that work hard.  They know

21   their Xs and Os, but you got kids not

22   wanting to play for them and you got coaches

23   not wanting to coach with them because of

Page 64

1    you -- and you touched on this a little

2    while ago, but did you notice anything in

3    his tone or his reaction that indicated any

4    type of threat?

5        A.    I never felt physically

6    threatened, you know.  He made a lot of

7    other threats about going to the State

8    Department and that kind of thing, but

9    that's par for the course with a lot of

10   people who are upset about different things.

11   But he was very domineering.  I think you'll

12   notice from the transcript.  He cut me off

13   on numerous occasions.  His wife tried to

14   say something a few times, and he cut her

15   off.  So, in that respect, yes; but other

16   than that, you know, he sat there and had a

17   descent conversation, as did his wife, but

18   he was very angry even then.

19       Q.    And as I read it and as I

20   listened to the tapes, I noticed the

21   conversation with you, it seemed cordial to

22   me; is that correct?

23       A.    I would characterize that for

Page 65

1    the most part it was cordial.  Yeah, I would

2    say for the most part, but there were times

3    that it wasn't as cordial.

4         Q.    And when you met with

5    Mr. Adams, Mr. Adams indicated to you that

6    his tone was more angry, I guess?

7         A.    Well, Ms. Passmore and

8    Mr. Adams did.  They used a little bit more

9    colorful words, but indicated that it was

10   very threatening.

11        Q.    Did y'all discuss anything

12   about Ms. Hutchison being cut?  Her hand

13   being cut?

14        A.    Only that that was the

15   reasoning for him coming up there.

16        Q.    Okay.  Can you understand in

17   any way, him being upset that his wife was

18   cut and that she had told him some issues?

19   Can you understand that in any way?

20        A.    I would imagine as a spouse I

21   would.  Yeah, I would guess so.

22        Q.    And you said you talked to

23   Mr. Adams and Ms. Passmore after your

1    seen something that insinuates there was a

2    race issue, except for the deposition.

3        Q.    Okay.  And in your opinion, is

4    stating that I'd like to file a formal

5    complaint, would that qualify as a

6    complaint?

7        A.    I get phone calls, you know,

8    monthly from someone saying I want to

9    complain about so and so.  And if they're an

10   employee, we always refer them to our

11   grievance procedure and tell them to, you

12   know, go share your concern with your

13   supervisor and follow the procedure.

14              If it's not an employee, if

15   it's just a parent on the street, we tell

16   them, please put it to us in writing.  Let

17   us have an opportunity to investigate it and

18   so forth, and we'll do so.  That's typically

19   what we tell them.

20       Q.    Okay.  But is it your

21   understanding, that employees can file

22   internal complaints by registering their

23   complaints to a supervisor?

1          A.     Absolutely.

2                 MS. SMITH:  Object.  Are you

3     talking in writing or orally?  They file a

4     complaint with their supervisor in writing

5     or orally?

6                 MR. WILSON:  Well, I'll ask

7     both of those questions again.

8          Q.     Is it your understanding that

9     filing an oral complaint to a supervisor is

10    allowed?

11         A.     Yes.  But let me clarify that.

12    On the -- In the workplace setting, let's

13    say, let's use a teacher as an example.  If

14    they're not happy about the way that the

15    janitor is talking negatively at this

16    particular teacher every day; that teacher

17    can go to that principal and say, you know,

18    I wish you'd talk to the janitor because

19    he's being mean to me when he talks to me.

20    That's one type of complaint.

21                And then, there's what I would

22    call a formal complaint, where that teacher

23    puts in writing to that principal that this

Page 103

```
1          Q.      Well, the school.
2          A.      The school encompasses all the
3    students that go to our school system.  So,
4    whatever the makeup of our school system is,
5    that's typically, because they're all going
6    to go to that school.  So, I would guess
7    it's probably sixty percent black, forty
8    percent white.  Somewhere around there.
9          Q.      And the community, is it
10   predominantly a black area?
11         A.      Yes.  It's probably
12   ninety-eight percent.
13         Q.      Are you aware of any other
14   EEOC charges that have been filed against
15   the school board in the past five years?
16         A.      Well, none that I'm aware of.
17   I mean, I've only been here three.
18         Q.      Okay.
19         A.      But I couldn't find anything
20   in any records that we have.
21         Q.      Any lawsuits been filed
22   against the school board in the past, since
23   you've been there?
```

```
 1    is for me to help them understand the

 2    complexities of organizations, and what

 3    motivates people.  And if you as a school

 4    administrator understand those dynamics that

 5    are taking place, then you will be a more

 6    effective leader.  And so, that's what the

 7    gist of the class is about.

 8         Q.    Okay.  Have you had any

 9    training in regards to sexual-harassment,

10    racial-harassment-type issues?

11         A.    Formal training in sexual

12    harassment, but not racial harassment.

13         Q.    What type of formal training?

14         A.    Just meetings I've had to

15    attend, and workshops, and things like that.

16         Q.    Since you've been with Phenix

17    City Schools?

18         A.    No, not since Phenix City, but

19    prior to that.

20         Q.    Do you do anything to let your

21    subordinates know about

22    sexual-harassment-type issues?

23         A.    We talk about it at
```

Page 108

1    principal's meetings.  And then, again, just

2    like always, because I don't have the

3    day-to-day contact with the teachers and

4    other personnel, we go over things like that

5    with our department heads and our

6    principals.  And it's their responsibility

7    to then relay that to others.

8               Now, on occasion, if there's

9    an issue that's a hot-button issue, for

10   example, when to contact the department of

11   human resources in an abuse situation.  If

12   there's a hot-button issue like that, we

13   will do something special, like have our

14   board attorney come to our teacher's

15   institute and do a presentation to our

16   entire group.  But we don't do something

17   like that with every issue, you know, like

18   that, just whenever it's a hot-button issue.

19   Maybe there's been three or four cases in

20   the news, which they let us remind our folks

21   what the proper procedures are.

22          Q.    Can you recall ever going to

23   inform your subordinates in any way about

Page 109

1    any type of racial harassment policies, or

2    problems, or anything like that?

3            A.      No.

4                    MR. WILSON:  I think that's

5    all I have.  Thank you for your time.

6                    MS. SMITH:  I have nothing.

7    Thank you.

8    (The deposition was concluded at 12:30 p.m.,

9    April 11th, 2007.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# White  Deposition

Page 24

```
1        Q.      And the knowledge that you and

2    the Board relied on to nonrenew her contract

3    is based this Dr. DiChiara's recommendation?

4        A.      Yes, sir.

5        Q.      And what he testified to

6    earlier, based on his knowledge of it, is

7    what you also base your decision on?

8        A.      Yes, sir.

9        Q.      Did the Board conduct any

10   other independent investigation of

11   Ms. Hutchison?

12       A.      No, sir.

13       Q.      And then, number three there,

14   is basically asking for the same thing.  The

15   Board's reasons for terminating/nonrenewing

16   the Plaintiff.  Again, is that based on

17   Dr. DiChiara's recommendation?

18       A.      When we actually take the

19   vote, it's based on that.  And we are

20   counting on, you know, he and his personnel

21   doing the things that they need to do in

22   order to make these types of

23   recommendations.
```

Page 25

```
1          Q.     Number four's asking about the

2     Board's policies and procedures relating to

3     termination and nonrenewal of contracts for

4     nontenured employees.  This is Plaintiff's

5     Exhibit 7.  This is titled Nonprobationary

6     Status.  Would number four relate to that

7     document?

8          A.     Yes, sir, I think that it

9     would.  I believe it -- Yes, sir.  I think

10    that's it.

11         Q.     Okay.  Number five asks for

12    the Board's policies and procedures

13    regarding racial harassment in the

14    workplace.  Do you know what the Board's

15    policies and procedures are regarding racial

16    harassment in the workplace?

17         A.     I don't believe the we -- I

18    mean, we don't have a specific procedure or

19    policy as we do a sexual harassment policy.

20    I would think it comes, you know, under the

21    status of we don't discriminate, and

22    therefore we don't allow -- we should not

23    allow that type of thing.  So, you know, I
```

Page 26

1    don't know that we have a specific policy

2    for it.

3         Q.     And do you know why that is?

4         A.     Well, it's something that --

5    Of course, we have a sexual harassment

6    policy, I think, because everybody in the

7    world has a sexual harassment policy.  It's

8    been a very big issue.  As far as racial

9    harassment, I don't think that that's been a

10   problem, and therefore we don't have a

11   policy specific to that.

12        Q.     Okay.  Would the same go for

13   retaliation?

14        A.     Exactly.  We don't have a

15   retaliation policy; but, again, I think

16   within terms of any personnel issues, that's

17   not something that you would do.

18        Q.     If you'll turn the page to the

19   next -- the document titled Equal

20   Opportunity Employment.

21        A.     Yes, sir.

22        Q.     The second paragraph there

23   discusses or states:  The superintendent

Page 28

1          Q.      As far as the Board's

2    concerned, should the superintendent and

3    other representatives under the

4    superintendent investigate all complaints

5    that are made to them?

6          A.      Yes, sir, I would think so.

7          Q.      And does the Board take the

8    position whether or not that representative

9    should make a determination on the merits of

10   that complaint?

11         A.      I would think that, yes, we

12   do.  Like, if they investigate, then

13   whatever is their judgment on those

14   complaints.

15         Q.      What about prior to an

16   investigation, should they determine whether

17   or not it's worth investigating, based on

18   their belief and the merits of that

19   complaint?

20         A.      No.  I believe that they

21   should and would look into whatever

22   complaint that they know, you know, that

23   someone has made.

Page 29

1          Q.     Okay.  So, the Board's

2     position is that if a complaint's made, no

3     matter what circumstances or what that

4     complaint alleges, the person should

5     investigate that complaint?

6                MS. SMITH:   Object to the form

7     of the question.

8          A.     I would think that they would,

9     if someone has -- But first, I think, that

10    probably they -- it's like if someone comes

11    to me as a board member with a complaint, I

12    would go to Dr. DiChiara.  It's not

13    something that I investigate myself.  And he

14    may investigate it, or he may have someone

15    who is over that particular area investigate

16    whatever the problem is.

17         Q.     Okay.  And as far as the

18    Board's concerned, are you aware of any

19    investigations that Dr. DiChiara took

20    regarding Ms. Hutchison's complaints?

21         A.     No, sir.

22         Q.     Are you aware of any

23    investigations that Mr. Adams took in

Page 30

1    regards to Ms. Hutchison's complaints?

2            A.      No, sir.

3            Q.      Do you know if Dr. DiChiara

4    met with you, or anyone with the Board,

5    after he had met with Ms. Hutchison and

6    Mr. McCart?

7            A.      I know that we did not.

8            Q.      Okay.  You know you did not?

9            A.      I know we didn't.  That's

10   right.  I know I did not.

11           Q.      And do you know if Mr. Adams

12   met with anyone at the Board after he had

13   met with Mr. Hutchison and Mr. McCart?

14           A.      I know he did not either.

15           Q.      So, in regards to

16   Ms. Hutchison's allegations that she made a

17   complaint, the Board can only rely on

18   whatever investigation Mr. Adams took?

19                   MS. SMITH:  Object to the form

20   of the question.

21           A.      I would assume Mr. Adams, and

22   then whoever else he was working with,

23   whether it was Ms. Passmore, because she's

Page 37

1    Plaintiff's alleged performance problems, if

2    any, while employed with the Board of

3    Education, including dates, verbal and

4    written warnings, reasons for said warning,

5    person issuing warning, and the race and any

6    follow-up counseling the Plaintiff may have

7    received regarding said warning.  Are you

8    aware of Ms. Hutchison having any

9    performance problems?

10         A.    No.

11         Q.    Do you know if that was ever

12   made an issue for the reasons for her

13   nonrenewal?

14         A.    No.

15         Q.    You don't know, or. . .

16         A.    No, I don't know.

17         Q.    Okay.

18         A.    Other than what's been said

19   here recently, no, I do not.

20         Q.    Okay.  And if you'll look at

21   Plaintiff's Exhibit 4, which is the EEOC

22   Position Statement, page three.  In the

23   third paragraph there, it says:  Charging

Page 38

```
 1   party was not terminated because of poor

 2   work performance.  Instead, reasons for her

 3   termination were that she complained

 4   constantly to her supervisor, and when the

 5   supervisor attempted to have charging party

 6   and the alleged wrong-doer meet together

 7   with the supervisor, charging party always

 8   refused to do so.

 9        A.   Okay.

10        Q.   Back to that first sentence.

11   It says:  Charging party was not terminated

12   for poor work performance.  Now, you were in

13   here a minute ago when Mr. Sparks testified

14   that his reason for following Ms. Passmore's

15   recommendation was because of teamwork and

16   poor performance problems.  Do you remember

17   that?

18        A.   I remember that, yes, sir, I

19   do.

20        Q.   All right.  Can you explain to

21   me the discrepancy in those -- in that?

22             MS. SMITH:  Object to the form

23   of the question.
```

Page 43

1    Mr. Lowe is.  His job requires -- He needs

2    to be around, and I have a little more

3    flexibility in the schedule.  And plus the

4    fact that I'm the vice-president of the

5    Board, so, you know, I could do that.

6         Q.    Okay.  I had brought up some

7    issues earlier about when I was talking to

8    Dr. DiChiara about some racial issues that

9    were going on at South Girard about someone

10   complaining that this would be a segregation

11   of the schools again for the newspaper

12   article.  And you're welcome to look at it

13   if you want.

14        A.    Oh, I'm okay.

15        Q.    Okay.  Do you remember that

16   issue?

17        A.    Yes, sir, I do.

18        Q.    Do you know if the Board had

19   any discussions about that issue?

20        A.    Yes, I do.  We did have

21   discussions regarding that, regarding the

22   whole process of grade reconfiguration, and

23   how we would set those up.

Page 44

```
 1          Q.    Okay.  And you recall some

 2    parties being concerned about that South

 3    Girard would be left with more black

 4    students?

 5          A.     There was concern, yes.  I

 6    know that from certain people there were.

 7    But I know, from my understanding, the way

 8    we were talking about splitting who would go

 9    to which middle school, there would have

10    been, hopefully if people didn't move or

11    leave or whatever, there would have been

12    some equity in those two schools.  That's

13    what we had tried for.

14          Q.    Okay.  And what was the final

15    result?

16          A.     The final result, we did not

17    specifically go with the two schools that

18    they planned.  I had a conversation with one

19    of -- Mr. David Wilson downtown, and he had

20    talked with Dr. DiChiara, and of course we

21    all talked to Dr. DiChiara, but they had

22    come up with another plan that might have

23    been, as far as room and stuff, would have
```

Page 45

1    worked just as well.

2               And that's the plan that we

3    have now, where the fifth graders did move

4    back to the elementary schools.  And we put

5    the sixth and seventh graders, which is

6    closer to a middle school-type atmosphere,

7    at the intermediate school.  And then, the

8    eighth graders at South Girard.  And then,

9    that way, too, it gave all the students in

10   Phenix City an opportunity to go through

11   what we call our NASA School.

12              And that was one of the

13   concerns that maybe I had had, was that not

14   every kid would get to go through that, and

15   it's basically science based.  That's what

16   happened.

17         Q.    Do you recall any other issues

18   where race was brought up as an issue

19   regarding South Girard?

20         A.    As far as regarding South

21   Girard, as Dr. DiChiara said specifically,

22   there are people who are concerned because

23   of the location of the school, itself,

Page 45

1    worked just as well.

2              And that's the plan that we

3    have now, where the fifth graders did move

4    back to the elementary schools.  And we put

5    the sixth and seventh graders, which is

6    closer to a middle school-type atmosphere,

7    at the intermediate school.  And then, the

8    eighth graders at South Girard.  And then,

9    that way, too, it gave all the students in

10   Phenix City an opportunity to go through

11   what we call our NASA School.

12             And that was one of the

13   concerns that maybe I had had, was that not

14   every kid would get to go through that, and

15   it's basically science based.  That's what

16   happened.

17        Q.    Do you recall any other issues

18   where race was brought up as an issue

19   regarding South Girard?

20        A.    As far as regarding South

21   Girard, as Dr. DiChiara said specifically,

22   there are people who are concerned because

23   of the location of the school, itself,

Page 46

1    because it is in a predominantly black

2    neighborhood, and it's not as nice maybe a

3    neighborhood as far as economics and that

4    kind of thing, as other parts of town.

5               From personal experience with

6    the school, my daughter went through there

7    and she's fine.  It was a great school.

8        Q.    Have you ever heard any

9    statements or any comments from anyone

10   stating, we don't need to raise any -- or

11   make race an issue out of anything going on

12   at South Girard?

13              MS. SMITH:  Object to the form

14   of the question.

15       A.    Yeah.  I'm not sure that I

16   exactly understand.

17       Q.    Yeah.  Me neither.  I guess

18   what I'm trying to say is, I've heard some

19   discussion about people concerned about race

20   issues at South Girard.  And I'm just

21   wondering if you've heard anyone make any

22   statements similar to the effect that, let's

23   not make race an issue over there?

Page 31

1    over that particular area.

2         Q.    Okay.  But as far as that's

3    concerned, the Board -- the only thing that

4    you've relied on would be Mr. Adams

5    investigation, and anything that he did with

6    Ms. Passmore?

7         A.    That's correct.  That's one

8    thing we're very much cautioned on, in

9    trying not to do with -- we're not -- our

10   jobs as a board member is not to micromanage

11   what happens on the day-to-day basis at the

12   schools and at the Central office.

13        Q.    If you'll look at page nine,

14   and you've already flipped the page there.

15   The identity of the individual who replaced

16   or otherwise assumed the Plaintiff's job

17   duties upon her nonrenewal/termination, we

18   found out a little while ago that that was

19   Mary Carter, a black female.  Is that

20   correct?

21        A.    From what we said here, yes,

22   sir.

23        Q.    Okay.  Number ten, the

# Pritchett  Deposition

FREEDOM COURT REPORTING

```
 1        A.     No.

 2        Q.     Do you remember the incident

 3   where Ms. Hutchison cut her hand?

 4        A.     Yes.

 5        Q.     And we've established, I

 6   believe, that was November 9th, 2004.  Tell

 7   me what you remember about that incident.

 8        A.     Brenda and I were in the

 9   office, and Lynne come in.  Her finger was

10   cut, and she said that Ms. Annie pulled --

11   snatched the Saran Wrap from her hand, and

12   Brenda looked at it and took her downtown.

13        Q.     Okay.  You didn't go downtown

14   with them?

15        A.     No, sir.

16        Q.     Do you remember them coming

17   back that day?

18        A.     Yes.

19        Q.     And did she -- Do you remember

20   her finishing work that day?

21        A.     I can't remember.

22        Q.     And that was on November 9th.

23   November 10th, Ms. Densel said there was a
```

```
1    meeting where Ms. Passmore came over and

2    discussed with her some things.  Do you

3    remember the next day, Ms. Passmore coming

4    over?

5         A.    Yes.

6         Q.    Were you in a meeting with

7    Ms. Passmore that morning?

8         A.    Yes.

9         Q.    And where did that meeting

10   take place?

11        A.    In the office.

12        Q.    Whose office is that?

13        A.    Brenda's office.

14        Q.    Did you have an office also?

15        A.    No, sir.  We shared.

16        Q.    You also worked out of that

17   office?

18        A.    Yes, sir.

19        Q.    Okay.  But it was called

20   Brenda's office?

21        A.    Yes.  Well --

22        Q.    Both.  Whatever.  What do you

23   remember Ms. Passmore saying in that
```

```
 1    meeting?

 2         A.    I'm trying to think.  I think

 3    she was upset.  I really don't remember

 4    everything.  I know she was upset that

 5    something -- Lynne and her husband came down

 6    to the office.

 7         Q.    She discussed that, about

 8    Ms. Hutchison and Mr. McCart coming to her

 9    office the day before?

10         A.    Yes.

11         Q:    And she seemed upset about

12    that?

13         A.    She was upset, yes.

14         Q.    And I know it's difficult to

15    remember things from a long time period ago,

16    but I'm just trying to get you to remember

17    the best you can.  Do you remember anything

18    she said about that meeting?

19         A.    No.  I walked out to check on

20    the on the ladies, talked a little bit, but

21    I don't remember.  I did come back in, and

22    they were talking.  I don't remember.

23         Q.    Do you remember them
```

Page 29

1          Q.      And you remember them,

2     Ms. Passmore and Ms. Densel, going to

3     Mr. Spark's office; correct?

4          A.      Yes, sir.

5          Q.      Do you remember if anyone ever

6     came to you with any questions or anything

7     about Ms. Hutchison?

8          A.      What do you mean?

9          Q.      Well, did Ms. Passmore ever

10    ask you any of your thoughts, or have any

11    questions for you about Ms. Hutchison?

12         A.      No, sir.

13         Q.      Did Mr. Sparks?

14         A.      No, sir.

15         Q.      Mr. Adams?

16         A.      No, sir.

17         Q.      And you stated that you don't

18    recall when you found out Ms. Hutchison was

19    getting nonrenewed?

20         A.      Right.

21         Q.      Just kind of refreshing what

22    happened, she was -- the decision was made

23    November 10th, 2004.  Her last day of

# Sparks  Deposition

FREEDOM COURT REPORTING

```
 1   to you?

 2          A.      I want to say Penny Passmore

 3   at the time, I think.  And, of course,

 4   talked to Mr. Adams somewhat.

 5          Q.      Do you remember there being

 6   any problems with Ms. Walker's supervision

 7   of the Child Nutrition employees?

 8          A.      Not any major problems.  What

 9   would you consider a problem?

10          Q.      That's a good question.  The

11   good thing is, I get to ask them.

12          A.      Well, you said if I don't

13   understand.

14          Q.      All right.  Any issues that

15   were going on in regards to employees taking

16   food out of the kitchen, or anything like

17   that?

18          A.      No, sir.  No, sir.

19          Q.      You don't remember?

20          A.      Not that I was aware of.

21          Q.      Okay.  My understanding is

22   Ms. Walker retired; is that correct?

23          A.      She -- Yes, she did retire.
```

FREEDOM COURT REPORTING

Page 20

 1    But, of course, she's deceased now.

 2            Q.      Right.  Did you know

 3    Ms. Hutchison as an employee of the Child

 4    Nutrition Program?

 5            A.      Yes, sir.

 6            Q.      Okay.  Did you know her just

 7    from knowing your employees, or did you know

 8    her any other way?

 9            A.      No, sir.

10            Q.      For example, you might know

11    her just because you go to the kitchen to

12    talk to the employees, or something like

13    that?

14            A.      Right.

15            Q.      Okay.  Had you ever heard

16    anything about Ms. Hutchison having -- First

17    of all, let me ask when Ms. Walker was

18    there, did you ever hear anything, any

19    problems that Ms. Hutchison had with the

20    other employees?

21            A.      No.  Not that I can recall.  I

22    mean, I do remember maybe sitting down and

23    talking with them, just in general of I

FREEDOM COURT REPORTING

Page 23

1    Passmore, and of course Ms. Densel.  And

2    maybe later that morning, I probably spoke

3    with Mr. Adams, I'm sure.

4         Q.    Can you try to remember

5    anymore, whether or not you met with either

6    Ms. Passmore or Ms. Densel the day of the

7    incident?

8         A.    No, I didn't.  I know I

9    didn't.

10        Q.    You don't remember one way or

11   the other, or you don't think you did?

12        A.    I don't recall meeting with

13   them the day of the incident.

14        Q.    Okay.  So, you would think it

15   was the next day, probably?

16        A.    It was either that afternoon,

17   or the next morning.

18        Q.    Okay.

19        A.    But to pinpoint, no, I can't.

20   I really don't remember.

21        Q.    Okay.  Do you know if they

22   had -- When they first discussed this with

23   you, do you know if they discussed anything

Page 24

1    about Ms. Hutchison and her husband coming

2    to the school?

3          A.    No.

4          Q.    You don't remember hearing

5    anything about that?

6          A.    The only thing I remember, as

7    far as Ms. Hutchison's husband I guess

8    getting involved in the situation, was a

9    meeting that took place downtown.  That's

10   the only thing I was aware of.

11         Q.    Okay.  Around this same time

12   period?

13         A.    Yeah, I think so.

14         Q.    Okay.

15         A.    I mean, it may have been a day

16   or two after.  I'm not sure.

17         Q.    And what do you recall hearing

18   about that?

19         A.    From my understanding, I think

20   they spoke with Mr. Adams; and what was the

21   conversation, I really don't know.  But from

22   my understanding, I guess Ms. Hutchison's

23   husband was upset.  He and Mr. Adams

Page 25

```
 1    exchanged some words, and as far as I know,

 2    Mr. Adams asked him to leave.

 3         Q.    Do you know Ms. Hutchison's

 4    husband at all?

 5         A.    No, I don't.

 6         Q.    As far as you know, you've

 7    never met him?

 8         A.    If he were to walk through

 9    here right now, I wouldn't know who he is.

10         Q.    Do you recall around this time

11    period, either one of these -- one of these

12    days, Ms. Passmore and Ms. Densel recommend

13    to you that Ms. Hutchison should be

14    nonrenewed?

15         A.    No.

16         Q.    Do you remember them

17    recommending that to you some other time?

18         A.    Right.  Towards the end of the

19    school year.

20         Q.    So, you don't remember

21    anything about discussing her nonrenewal

22    around the November of 2004, time period?

23         A.    No.
```

Page 29

1    evaluations in a meeting with Ms. Passmore

2    and Ms. Densel?

3          A.     Well, if we were discussing

4    nonrenewal, I think it's only right that I

5    go back and look at her past performance, to

6    make sure that we have a pretty good concept

7    of why we would be nonrenewing her.

8          Q.     And what is your understanding

9    of the reason why they were recommending

10   nonrenewal?

11         A.     Well, I would say mainly, I

12   guess, what I would call being flexible,

13   ability to work as a team.

14         Q.     Did they bring up anything

15   about her performance and not working as a

16   team?

17         A.     As far as I can remember, yes.

18         Q.     Did they bring up anything

19   about her not being a good employee, or

20   anything like that?

21         A.     Well, I wouldn't say not being

22   a good employee, but taking into

23   consideration if you're working in a

FREEDOM COURT REPORTING

Page 30

```
 1    cafeteria, I guess the people have to work

 2    independently.  There are certain things

 3    that each individual had to do to make sure

 4    that the meals are being processed and get

 5    out on time.  So, that involves teamwork.

 6           Q.    Okay.  And I guess what I'm

 7    trying to get at, were they trying to say

 8    she was having problems with teamwork?

 9           A.    Yeah.  From my understanding,

10    yes.

11           Q.    Did they say anything about

12    her having problems with any other specific

13    employees?

14           A.    No.

15           Q.    No, or you don't remember?

16           A.    No.  I don't recall them

17    bringing up any specific employees that she

18    was having problems with at that time.

19           Q.    Do you remember them making an

20    issue at all of the fact that the other

21    employees were black and she was the only

22    white employee?

23           A.    No.  No.
```

Page 31

```
1          Q.      Did they discuss anything

2     about her husband?

3          A.      No.  Not that I recall.

4          Q.      You don't recall them bringing

5     anything up about her husband being a

6     potential threat, or anything like that?

7          A.      Not actually at the -- when we

8     had our last meeting, I guess, in reference

9     to the nonrenewal, no.  It was strictly

10    about her.

11         Q.      Okay.  Do you know why your

12    signature's not on this 2005 evaluation?

13         A.      That I don't know.  That's a

14    good question.

15         Q.      What's the general policy on

16    evaluations?  Is it supposed to be signed by

17    her immediate supervisor?

18         A.      Right.  Typically, the

19    cafeteria manager would do the evaluation,

20    of course.  It would be signed by the

21    director of Child Nutrition Program, and I

22    would also sign it.

23         Q.      Would you review it with that
```

Page 31

```
 1        Q.      Did they discuss anything
 2   about her husband?
 3        A.      No.  Not that I recall.
 4        Q.      You don't recall them bringing
 5   anything up about her husband being a
 6   potential threat, or anything like that?
 7        A.      Not actually at the -- when we
 8   had our last meeting, I guess, in reference
 9   to the nonrenewal, no.  It was strictly
10   about her.
11        Q.      Okay.  Do you know why your
12   signature's not on this 2005 evaluation?
13        A.      That I don't know.  That's a
14   good question.
15        Q.      What's the general policy on
16   evaluations?  Is it supposed to be signed by
17   her immediate supervisor?
18        A.      Right.  Typically, the
19   cafeteria manager would do the evaluation,
20   of course.  It would be signed by the
21   director of Child Nutrition Program, and I
22   would also sign it.
23        Q.      Would you review it with that
```

Page 42

1                          Reporter.)

2            Q.     Did your involvement with the

3     decision to nonrenew Ms. Hutchison end with

4     your recommendation to Mr. Adams?

5            A.     I don't understand what you're

6     asking me.

7            Q.     Well, were you involved in any

8     other discussions or proceedings or anything

9     involved with Ms. Hutchison, other than your

10    discussion with Mr. Adams?

11           A.     No.  After we had that

12    conversation, I was done with it.

13           Q.     Did Dr. DiChiara ever come to

14    you and ask about Ms. Hutchison?

15           A.     No.

16           Q.     Did anyone from the Board come

17    to talk to you about Ms. Hutchison?

18           A.     No.

19           Q.     And do you remember being at a

20    Board meeting where Ms. Hutchison's

21    nonrenewal was discussed?

22           A.     No.

23           Q.     If you'll just let me finish,

Page 43

```
 1    because she's got to type it down.

 2                Do you remember hearing

 3    anything about Ms. Hutchison's husband being

 4    a threat to anyone?

 5         A.    Brenda mentioned that to me

 6    after they had -- I guess after the incident

 7    had took place.

 8         Q.    Do you remember what she said

 9    to you?

10         A.    She was just scared.

11         Q.    Did she tell you why she was

12    scared?

13         A.    I guess just in reference to

14    what had took place.

15         Q.    And do you know what took

16    place?

17         A.    Only based on what I was told.

18         Q.    What you were told by who?

19         A.    Brenda, and when I talked with

20    Mr. Adams.

21         Q.    Okay.  And what did they tell

22    you?

23         A.    Basically, that I guess he was
```

FREEDOM COURT REPORTING

Page 44

1    upset, and he was irate at the time.

2         Q.    At the time of the meeting

3    with Ms. Hutchison, Mr. McCart, whose her

4    husband, and Mr. Adams?

5         A.    That's correct.

6         Q.    And Ms. Passmore?

7         A.    That's correct.

8         Q.    And did you talk to

9    Ms. Passmore about that at all?

10        A.    Right.

11        Q.    You did?

12        A.    Uh-huh.

13        Q.    Is this all in one meeting?

14        A.    No.  I talked with Mr. Adams,

15   I think, on a separate occasion.  And then,

16   I spoke with Ms. Passmore, I guess a couple

17   days after that happened.  It may have been

18   the next day.  I'm not sure.

19        Q.    Did you do anything to talk to

20   Ms. Hutchison about what happened?

21        A.    No, I didn't.

22        Q.    You didn't go to meet with

23   her, or interview her, or anything like

Page 45

```
 1    that?

 2         A.     I don't think I did.

 3         Q.     Do you know if Ms. Densel was

 4    present at the meeting with Mr. McCart?

 5         A.     I don't think so.  I don't

 6    think so, but that I'm not sure of.

 7         Q.     My understanding is, she

 8    wasn't.  And did she say anything about why

 9    she thought he was a threat in any way, if

10    she had never met with him?

11         A.     I guess, based on just what

12    had took place in Mr. Adams' office.

13         Q.     Do you know anything about

14    what took place there?

15         A.     Besides the conversation they

16    had, no, sir, I don't.

17         Q.     Okay.  What do you know about

18    the conversation they had?

19         A.     He was irate, and he was

20    upset.

21         Q.     Okay.  Do you know about --

22         A.     As far as the conversation,

23    no.  I don't know what took place, as far as
```

Page 47

1  any allegations of racial problems that were

2  going on?

3      A.    No, sir.  Not that I recall.

4      Q.    Did Ms. Passmore bring up any

5  allegations of any racial activity that was

6  going on?

7      A.    No, sir.

8      Q.    You got to let me finish.

9  Like I said, even though you might know the

10  answer.

11     A.    Okay.

12     Q.    So, is it fair to say that any

13  recommendation that you made regarding

14  Ms. Hutchison's nonrenewal was based on what

15  Ms. Densel and Ms. Passmore told you?

16     A.    That's correct.

17     Q.    Do you know who replaced

18  Ms. Hutchison?

19     A.    No, I don't, sir.

20     Q.    In the interrogatory

21  responses, the Defendants say Mary Walker

22  was transferred from Central High School.

23  Do you know if that's correct?

Page 52

```
 1        Q.     Okay.  For that particular

 2   school year?

 3        A.     That's correct.

 4        Q.     So, would it be referring to

 5   this Plaintiff's Exhibit 2 here?

 6        A.     That is correct.  That would

 7   be part of, I guess, the overall

 8   observation, to see whether the employee

 9   would be recommended or not.

10        Q.     Okay.

11        A.     But I'm sure it wouldn't be

12   solely based on this.

13        Q.     Okay.  But in general, this is

14   a satisfactory performance appraisal;

15   correct?

16        A.     It's satisfactory, but needs

17   more improvement.

18        Q.     On one category?

19        A.     Uh-huh.

20        Q.     But satisfactory on the

21   remaining fifteen categories?

22        A.     That is correct.

23        Q.     But as far as the things you
```

Page 53

1    were told about teamwork problems, the

2    things that were relayed to you about her

3    problems with teamwork, would that be

4    considered a performance problem?

5         A.    I would say so, yes.

6         Q.    So, you're understanding is,

7    her decision to nonrenew her was based on

8    her performance?

9         A.    Yes, sir.  All right.

10              MR. WILSON:  I think that's

11   all I have.  Thanks for your time today.

12              MS. SMITH:  I have no

13   questions.

14   (The deposition was concluded at 3:15 p.m.,

15   April 11th, 2007.)

16

17

18

19

20

21

22

23

# Laney Deposition

FREEDOM COURT REPORTING

```
 1          A.      No, sir.

 2          Q.      Have you ever informed anyone,

 3   personally?

 4          A.      No.

 5          Q.      Is that something the

 6   personnel director does, generally?

 7          A.      Right.

 8          Q.      Okay.  And the personnel

 9   director at that time was Mr. Adams; is that

10   correct?

11          A.      That's correct.

12          Q.      During this meeting with

13   Ms. Hutchison, can you recall what Mr. Adams

14   told Ms. Hutchison?

15          A.      He told her that she was going

16   to be nonrenewed; that she would complete

17   her contract and then give her some specific

18   date, but that she would not be back to work

19   next year at the cafeteria.

20          Q.      Do you know if he gave her a

21   reason for that?

22          A.      He did not.  She asked, and he

23   said that it was a policy that he did not
```

1    provide a specific reason for a nonrenewal.

2        Q.    Do you remember

3    Ms. Hutchison's reaction of that?

4        A.    She was visibly upset and

5    asked several questions, basically,

6    regarding why she was going to be

7    nonrenewed.  And that was pretty much it.

8        Q.    Was she crying?

9        A.    She was.

10        Q.    And you don't recall Mr. Adams

11    giving her any reason at all?

12        A.    He did not.

13        Q.    And is that -- Do you

14    understand the policy, that you do not give

15    a reason to nonrenewed employees?

16        A.    Right.

17        Q.    And how did you become aware

18    of that policy?

19        A.    It's something you learn in

20    education leadership classes from the very

21    basic.

22        Q.    You got something that you go

23    through --

FREEDOM COURT REPORTING

```
1          A.      Not that I recall, no.

2          Q.      All right.  Did you discuss

3    with Mr. Adams the reason Ms. Hutchison was

4    let go?

5          A.      I asked him, and he said that

6    it was a recommendation from the Child

7    Nutrition manager.  And that was it.

8          Q.      Did you ask him before or

9    after the meeting with her?

10         A.      I asked him before when he

11   first came and told me that he was going to

12   call her down to my office.

13         Q.      And did he tell you the name

14   of the Child Nutrition director that he

15   called?

16         A.      I don't think he said.  I

17   think he just said the managers make the

18   recommendation, and we follow it from there.

19         Q.      Do you think he was referring

20   to Ms. Densel?

21         A.      I would assume so.

22         Q.      Or Ms. Passmore?

23         A.      It could have been either.  I
```

**FREEDOM COURT REPORTING**

Page 1

1    TAPE TRANSCRIPTION OF MEETING BETWEEN

2    MR. ADAMS, MS. PASSMORE, MR. MCCART AND

3    MS. HUTCHISON

4

5    COPY

6    MR. MCCART:  How do you get in

7  touch with the superintendent down here?

8    SECRETARY:  He's just next to

9  you, next door.

10    MR. MCCART:  Okay.  Who's in

11  charge over the employees in all the

12  schools?

13    SECRETARY:  Mr. Adams.  You

14  could talk to Mr. Adams, if you want to.

15    MR. MCCART:  Okay.  And who's

16  under him?

17    SECRETARY:  Who's under him?

18  His secretary would be Joy.

19    MR. MCCART:  Okay.  So, he's

20  in charge of the school employees, the

21  lunchroom and cafeteria and stuff like that?

22    SECRETARY:  Yeah.  He's the

23  one you would need to talk to, unless you

**FREEDOM COURT REPORTING**

Page 2

1    want to talk to Penny.

2                MR. MCCART:  Now, what?  Where

3    can I get in touch with him?

4                SECRETARY:  Penny?

5                MR. MCCART:  No, this other

6    man you talked about.

7                SECRETARY:  Mr. Adams?

8                MR. MCCART:  Yeah.

9                SECRETARY:  He's in the

10   building next door.

11               MR. MCCART:  Okay.  Is there

12   any way he can come over here?  I need to

13   talk to him and Ms. Passmore together.

14               SECRETARY:  Well, now,

15   Ms. Passmore can probably go over there with

16   you.

17               MR. MCCART:  Okay.

18               SECRETARY:  Just let her get

19   off the phone.

20               MR. MCCART:  Okay.

21               SECRETARY:  You all have a

22   seat.

23               MR. MCCART:  Do you have to

## FREEDOM COURT REPORTING

Page 3

1   pay for that, that you don't get?

2                MS. PASSMORE:  Hey.  I'm Penny

3   Passmore.

4                SECRETARY:  This is Will.

5   Will, this is Ms. Passmore.

6                MS. PASSMORE:  Hey, Will.

7   Have a seat.  How can I help you?

8                MR. MCCART:  She needs to fill

9   out a formal complaint about the hostile

10  treatment she's been getting over there for

11  the last couple of months.

12               MS. PASSMORE:  She's been

13  getting hostile treatment?

14               MR. MCCART:  Uh-huh.  And

15  today they cut her finger by snatching stuff

16  out of her hands, and this can't go on like

17  this.  I mean, you got, you know, kind of, a

18  one-sided population over there; and they're

19  just treating her and your other -- people

20  that are in charge over there, they're just,

21  you know, sweeping it under the rug; and

22  it's -- it's not going to continue.

23               MS. PASSMORE:  I hope.

Page 4

1          SECRETARY:  I told him that we

2   all --

3          MS. HUTCHISON:  I assumed we

4   would all come in here, and we would talk

5   about it.

6          MS. PASSMORE:  Uh-huh.

7          MR. MCCART:  But she needs to

8   go ahead and fill out a formal complaint,

9   too.

10          MS. PASSMORE:  Okay.  Gee,

11   I've not done that -- I've not covered that

12   before.

13          MR. MCCART:  Or if you can get

14   Mr. Adams over here or the superintendent;

15   I'd really like to meet the both of them.

16   Because, you know, she's let stuff go as

17   long as it's going to go.

18          MS. PASSMORE:  (She's talking

19   to someone on the telephone:  Hi.  Do you

20   know where he is?  Okay.  Joy, would you

21   have him call me?  I have somebody over here

22   waiting that would like to see him in my

23   office.  If he could just give me a call

**FREEDOM COURT REPORTING**

Page 5

1    when he gets back in his office.

2                    Hey.  Sorry.  Okay.  Just --

3    Would you ask him to either step over here

4    or either call me when he gets through.  I

5    have somebody waiting here that would like

6    to talk to him.  All right.  Thank you.)

7                    So, well, she -- today is the

8    first day -- I mean, she mentioned to me at

9    one point that some of them, you know, were

10   rude, but I -- but I mean, I did not --

11                   MR. MCCART:  No.  I understand

12   it's more than rude.  Because I told her to

13   try to get along with them over there as

14   much as she could, you know, but --

15                   MS. PASSMORE:  And I told her

16   today that I would transfer her over --

17                   MR. MCCART:  Well, she's

18   not -- you know, she really shouldn't be the

19   one being transferred.

20                   MS. PASSMORE:  Well, I know.

21   And that's --

22                   MR. MCCART:  See, I mean, you

23   know, right's right and wrong is wrong.

**FREEDOM COURT REPORTING**

Page 6

1        MS. PASSMORE:  I'll do what I

2   can, but I can't transfer them all.

3        MR. MCCART:  I know.

4        MS. PASSMORE:  You know.  And

5   I can't go over there and make them behave.

6   It's a shame.  And I told her, I said,

7   Honey, you may want to (inaudible) you know.

8   The one thing I don't want you to do is, I

9   don't want you to -- you know, we work for

10  the government, and so, you know, you've got

11  to be --

12        I'm just the kind of person

13  that what I say, if it comes out of my

14  mouth, I'm going to hope that I am telling

15  everybody the absolute truth.  And that I

16  hope that I treat you the same way I would

17  treat anybody else.

18        MR. MCCART:  That's the way it

19  ought to be.

20        MS. PASSMORE:  That's the way

21  I want to be treated.

22        MR. MCCART:  Exactly.

23        MS. PASSMORE:  And that's the

**FREEDOM COURT REPORTING**

Page 7

1   way it needs to be done.

2            MR. MCCART:  That's not the

3   way it is, though.

4            MS. PASSMORE:  Oh, I know.

5   And I can't go over there and spank them or

6   anything like that.

7            MR. MCCART:  Well, somebody

8   can.

9            MS. PASSMORE:  When you're

10  working with --

11           MR. MCCART:  They don't know

12  me.  I'm not a pushover like she is.  I

13  stand my ground, and I'll fight tooth and

14  nail.

15           MS. PASSMORE:  Yeah.  And I

16  hate that she's been upset, and I -- you

17  know.

18           MR. MCCART:  Well, there's no

19  point to --

20           MS. HUTCHISON:  What does she

21  say -- (inaudible)

22           MS. PASSMORE:  That's when I

23  told her that I would work with her or

**FREEDOM COURT REPORTING**

                                                    Page 8

1    whatever she wanted to do.  And -- you know,

2    and I --

3                    MR. MCCART:  If it was turned

4    around the other way, it wouldn't be going

5    on like this.

6                    MS. PASSMORE:  What do you

7    mean, turned around the other way?  Well, I

8    mean either way I would be taking -- doing

9    as much as I could to take care of it.  But

10   you know as well as I do, I can't go over

11   there and -- getting grown adults to act

12   like they need to act.

13                   MR. MCCART:  Well, there's got

14   to be some supervision somewhere that can.

15   I mean, somebody --

16                   MS. PASSMORE:  No, there's

17   not.

18                   MR. MCCART:  Somebody can make

19   them mind and stay in line.

20                   MS. PASSMORE:  You know.

21                   MR. MCCART:  I mean I run a

22   business for twenty-five years and either

23   they walked the line or else they hit the

# FREEDOM COURT REPORTING

Page 9

1    door.  I don't care who they are.

2              MS. HUTCHISON:  I told her,

3    you know.  We have our little meetings and

4    what, and Ms. Brenda she will say what --

5    certain things, and --

6              MR. MCCART:  Well, they don't

7    want to listen to her.  They don't want to

8    do who she tells them to.  I mean when Lynne

9    comes back out on the floor.  They don't

10   want to listen to what's supposed to be the

11   boss lady over there telling them what to

12   do, and they say don't have to do it that

13   way.

14              So, you know, either she's

15   going to have some authority over there, or

16   you or somebody's going to have to have some

17   authority.  And they don't want to listen to

18   that woman telling them what it's supposed

19   to be when she tries to follow the rules and

20   all that boss lady sets up.

21              MS. PASSMORE:  Uh-huh.

22              MR. MCCART:  And then when

23   she's goes back out on the floor and

# FREEDOM COURT REPORTING

Page 10

1    somebody's telling her, you don't do it that

2    way.  You do it my way.  Then there's a

3    problem with management.

4              MS. PASSMORE:  Exactly.  Well,

5    and then it puts her in a strange position.

6    Because if she goes in and there and tells

7    on them -- tells her that they're not

8    wanting to do it her way, then they get mad

9    at her.  Inaudible, and that's where I'm

10   trying to be fair.  (Inaudible)

11              (On the phone with someone.)

12              -- I mean, we can

13   definitely -- we can -- I mean you can file

14   a complaint.

15              MR. MCCART:  Now, I want it

16   all done, you know, legal, and -- so if we

17   need to get, you now, just some kind of

18   handle on it.  Because they're going to stop

19   right here.  Because I don't play around

20   with it.  I mean I done told her to take and

21   take and take.  But you know today when they

22   snatched that thing out of her hand --

23              MS. PASSMORE:  Now, how

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660

**FREEDOM COURT REPORTING**

Page 11

1  exactly did that happen?  Did y'all fight --

2          MS. HUTCHISON:  Okay.  I was

3  doing the dishes -- I was backup today.  So

4  I was helping washing the pots and pans.  I

5  all right.  I had the drawer open and all

6  with and Ms. Annie was there.  And I was,

7  you know, was me putting the utensils in the

8  drawer and so I was handing them.  And so

9  the way she grabbed it was, kind of, like

10  that (indicating).

11          MS. PASSMORE:  Did she

12  realize, or did she -- I mean did she know

13  that she had done that?

14          MS. HUTCHISON:  At times

15  she -- I don't know how else to put it, but

16  it -- you know.  I got this -- You know,

17  like I said earlier (inaudible), and then

18  just like this morning, it was -- All right.

19  I'm backup, so she should really have never

20  called me do the line.  But she should have

21  called Betty.

22          MS. PASSMORE:  Uh-huh.

23          MR. MCCART:  Well that's not

**FREEDOM COURT REPORTING**

Page 12

1   the issue.  Did she snatch it out of your

2   hand?  Yes or no?  You told me she did.

3                MS. HUTCHISON:  Yeah, but what

4   I'm saying is --

5                MR. MCCART:  And the other

6   stuff over there.  All the sugar and stuff

7   they've been taking out of the back door by

8   twenty-five pound bags and stuff like that.

9   That you've let go.

10               MS. HUTCHISON:  (Inaudible).

11               MR. MCCART:  You've let stuff

12  go untold and all that.

13               MS. PASSMORE:  Does Betty --

14  Does she know they're taking that?

15               MS. HUTCHISON:  Huh-uh.

16               MR. MCCART:  There's big old

17  large amounts of food going out the back

18  door.  I've seen them taking it out and

19  putting it in people's trucks by the back.

20               MS. PASSMORE:  When you're

21  waiting on her?

22               MR. MCCART:  When I'm waiting

23  on her.  I sit there and watched four or

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

Page 13

1    five trays being put into people's cars and

2    stuff like that.  You know, if they want to

3    stir some stink, I'll show them how to stir

4    it up.  So I ain't going to play with them.

5    I'll get the damn news people over there.

6    I'll go to the Alabama Attorney General.  I

7    ain't playing.  You know, if they want to

8    stir it up, we'll shake it up.

9                MS. PASSMORE:  Let me go see

10   if I can get Mr. Adams.

11               MS. HUTCHISON:  And I was

12   trying to hand it to her (inaudible).

13               MR. MCCART:  This is just a

14   minor cut, but that's not the issue.  It's

15   the snatching stuff.

16               MS. PASSMORE:  Let me get you

17   another Band-Aid.

18               MS. HUTCHISON:  When I go

19   home, if I was going to be at home, I take

20   it off because it feels better with it off.

21               MS. PASSMORE:  But down here,

22   when you're around people, you need to keep

23   it covered.  Let me go get a Band-Aid for

Page 14

1    it.  Did you clean it off with anything?

2              MS. HUTCHISON:  Yes, ma'am,

3    with some alcohol.

4              MS. PASSMORE:  Okay.

5              MR. ADAMS:  Hey, my name is

6    Jeff Adams.

7              MR. MCCART:  Will McCart.

8              MS. HUTCHISON:  I'm Lynne.

9              MR. ADAMS:  What's your name

10   again?

11             MS. HUTCHISON:  Lynne.

12             MR. ADAMS:  What's your last

13   name?

14             MS. HUTCHISON:  Hutchison.

15             MR. ADAMS:  Hutchison.  You've

16   been with us -- This is your second year?

17             MS. HUTCHISON:  This is my

18   second year, yes, sir.

19             MR. ADAMS:  Both years at

20   South Girard?

21             MS. HUTCHISON:  Uh-huh.

22             MR. ADAMS:  Okay.  All right.

23   Well, what's your problem?

Page 15

1        MR. MCCART:  She wants to file

2    a formal complaint about her treatment or

3    mistreatment, should I say, her work

4    environment.

5        MS. PASSMORE:  Show him your

6    hand.

7        MS. HUTCHISON:  We had talked

8    -- but me and Ms. Brenda had come down here

9    earlier and we spoke with Ms. Passmore here,

10   and she was saying that I could, you know,

11   be transferred or just stick it out and then

12   next year would probably be better, but

13   we --

14        MR. ADAMS:  I mean, obviously

15   we want to fix the problem, if there's a

16   problem there.  So I would suggest that you

17   do -- Write a formal outline of your

18   concerns, and you need to be specific.  I

19   think you've indicated that you felt that

20   you were being mistreated by some of the

21   other employees; is that right?

22        MS. HUTCHISON:  Uh-huh.

23        MR. ADAMS:  You need to give

**FREEDOM COURT REPORTING**

Page 16

1    specific examples of that and detail it and

2    you then you need to write it to me or

3    Penny.  We will then go in and go through

4    the process that we follow.

5                In these situations, there are

6    procedures in place for that.  So we can do

7    that and then at the end of this, we'll you

8    know, we'll get some options.  You know,

9    hostile environment, you need specifics,

10   okay?

11               Because you know, there are

12   environments that I've been in that I didn't

13   like, but you know, I assume from what Penny

14   told me a little bit, you've indicated there

15   is some racial hostility?

16               MS. HUTCHISON:  That's what I

17   feel like.

18               MR. MCCART:  You can see it?

19   Are you aware of it?  Can you see it when

20   you were over there?

21               MS. PASSMORE:  No.  I mean,

22   no.  I don't see it when I'm over there.  I

23   just know that she has mentioned -- she has

Page 17

1    mentioned it.

2                    MS. HUTCHISON:    (Inaudible)

3                    MR. ADAMS:    (Inaudible) It

4    will be a very different working environment

5    this year than it was last year.  We've made

6    some significant changes there.  Do you

7    agree?

8                    MR. MCCART:  There have been

9    changes, but they don't want to listen to

10   them.

11                   MS. HUTCHISON:  They don't

12   listen, Mr. Adams.

13                   MR. MCCART:  They don't want

14   to follow the boss lady's direction.

15                   MS. HUTCHISON:  Right.  Just

16   like yesterday, I was told to do the

17   broccoli a certain way.  And one of the

18   girls said, you don't have to listen to her.

19   You don't have do it that way.  That's too

20   long.  Just put it all in the kettle.

21                   MR. ADAMS:  Okay.  Well, I

22   mean and then you go back and tell the

23   supervisor -- I mean, what I would do in a

**FREEDOM COURT REPORTING**

Page 18

1   situation like that is I would do it the way

2   the supervisor told me to do it.

3                    MS. HUTCHISON:  Sir, I do.

4                    MR. ADAMS:  Okay.

5                    MR. MCCART:  And then they get

6   mad with her, and then I got to -- When she

7   comes home, then I've got to listen to,

8   well, they're telling me don't do it her

9   way, and the supervisor's telling me to do

10  it this way.

11                   MR. ADAMS:  Well, what I'm

12  saying is, you're not going to find the

13  perfect working environment.  But I mean I

14  don't want anybody to touch you or to use

15  profanity or to use any threatening remarks.

16  Any of those things, I can address, and I

17  can take care of.

18                   But now, when people are

19  verbally aggressive, and you just have to

20  tolerate it and go on and do what your

21  supervisor tells you to do.

22                   MS. HUTCHISON:  All right.

23  She's tells me to do something a certain way

**FREEDOM COURT REPORTING**

Page 19

1  and then the girls turn around and say, no,

2  you don't do it that way.

3  　　　　　MR. ADAMS:  Well, then what

4  I'm saying --

5  　　　　　MS. HUTCHISON:  And then they

6  start (inaudible) keep doing it the way that

7  I was told by the manager and then they keep

8  fussing.

9  　　　　　MR. ADAMS:  Well, I mean you

10  just have to turn a deaf ear to it.  I mean

11  you can -- if you're preparing this

12  particular item on the menu, you do it the

13  way your supervisor tells you and you just

14  ignore them.

15  　　　　　MS. HUTCHISON:  They make

16  comments --

17  　　　　　MR. MCCART:  No.  You just

18  listen a minute.  You go in there, and when

19  they tell you to do it a different way, you

20  go in there and you get the boss lady.  You

21  bring her out there and say, look, now,

22  you're telling me to do it this way, and

23  she's telling me to do it this way.

**FREEDOM COURT REPORTING**

Page 20

1          Don't play with them anymore.

2    I'm not putting up with it.  If I have to go

3    down there and get an attorney.  They're

4    stealing stuff out the back door, and if he

5    wants to let it go on, twenty-five pound

6    bags of sugar and this and that and the

7    other going on over there.  If they want to

8    let it fall --

9          MS. HUTCHISON:  I can see

10   where this is going very easily.  So you

11   probably need to get you an attorney.  I'd

12   suggest you do that.  You make -- Don't make

13   claims that you can't support with evidence.

14   I suggest you --

15          MR. MCCART:  I can support

16   with my eyeball.  I saw it first hand.

17          MR. ADAMS:  Okay.  Did you

18   make --

19          MR. MCCART:  So you're not

20   going to do anything about this today?

21          MR. ADAMS:  Do about what?

22          MR. MCCART:  About her

23   complaints.

Page 21

1          MR. ADAMS:  What is her

2     complaint, sir?

3          MR. MCCART:  About the

4     treatment and abuse that she's heard from

5     the other ladies over there.  They're well

6     aware of what's been going on.

7          MR. ADAMS:  She hasn't

8     indicated anything like that.

9          MR. MCCART:  I think she just

10    did, sir.

11

12

13

14

15

16

17

18

19

20

21

22

23

**FREEDOM COURT REPORTING**

Page 22

1              REPORTER'S CERTIFICATE

2    STATE OF ALABAMA,

3    ELMORE COUNTY,

4          I, Sara Mahler, Certified Shorthand

5    Reporter and Commissioner for the State of

6    Alabama at Large, do hereby certify that the

7    above and foregoing proceeding was taken

8    down by me by stenographic means, and that

9    the content herein was produced in

10   transcript form by computer aid under my

11   supervision, and that the foregoing

12   represents, to the best of my ability, a

13   true and correct transcript of the

14   proceedings.

15         I further certify that I am neither

16   of kin nor of counsel to the parties to the

17   action; nor in any manner interested in the

18   result of said case.

19

20

                     _____

21                   Sara Mahler, CSR,

                     for the State of

22                   Alabama at Large.

23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-800-373-3660**

# FREEDOM COURT REPORTING

**A**

ability 22:12
absolute 6:15
abuse 21:4
act 8:11,12
action 22:17
Adams 1:2,13
  1:14 2:7 4:14
  13:10 14:5,6,9
  14:12,15,19,22
  15:14,23 17:3
  17:12,21 18:4
  18:11 19:3,9
  20:17,21 21:1
  21:7
address 18:16
adults 8:11
aggressive 18:19
agree 17:7
ahead 4:8
aid 22:10
ain't 13:4,7
Alabama 13:6
  22:2,6,22
alcohol 14:3
amounts 12:17
Annie 11:6
anybody 6:17
  18:14
anymore 20:1
assume 16:13
assumed 4:3
attorney 13:6
  20:3,11
authority 9:15
  9:17
aware 16:19
  21:6

**B**

back 5:1 9:9,23
  12:7,17,19
  17:22 20:4
backup 11:3,19

bags 12:8 20:6
Band-Aid 13:17
  13:23
behave 6:5
best 22:12
better 13:20
  15:12
Betty 11:21
  12:13
big 12:16
bit 16:14
boss 9:11,20
  17:14 19:20
Brenda 9:4 15:8
bring 19:21
broccoli 17:17
building 2:10
business 8:22

**C**

cafeteria 1:21
call 4:21,23 5:4
called 11:20,21
care 8:9 9:1
  18:17
cars 13:1
case 22:18
certain 9:5
  17:17 18:23
CERTIFICA...
  22:1
Certified 22:4
certify 22:6,15
changes 17:6,9
charge 1:11,20
  3:20
claims 20:13
clean 14:1
come 2:12 4:4
  15:8
comes 6:13 9:9
  18:7
comments 19:16
Commissioner

22:5
complaint 3:9
  4:8 10:14 15:2
  21:2
complaints
  20:23
computer 22:10
concerns 15:18
content 22:9
continue 3:22
correct 22:13
counsel 22:16
COUNTY 22:3
couple 3:11
covered 4:11
  13:23
CSR 22:21
cut 3:15 13:14

**D**

damn 13:5
day 5:8
deaf 19:10
definitely 10:13
detail 16:1
different 17:4
  19:19
direction 17:14
dishes 11:3
doing 8:8 11:3
  19:6
door 1:9 2:10
  9:1 12:7,18
  20:4
drawer 11:5,8

**E**

ear 19:10
earlier 11:17
  15:9
easily 20:10
either 5:3,4 8:8
  8:22 9:14
ELMORE 22:3
employees 1:11

1:20 15:21
environment
  15:4 16:9 17:4
  18:13
environments
  16:12
everybody 6:15
evidence 20:13
exactly 6:22
  10:4 11:1
examples 16:1
eyeball 20:16

**F**

fair 10:10
fall 20:8
feel 16:17
feels 13:20
felt 15:19
fight 7:13 11:1
file 10:13 15:1
fill 3:8 4:8
find 18:12
finger 3:15
first 5:8 20:16
five 13:1
fix 15:15
floor 9:9,23
follow 9:19 16:4
  17:14
food 12:17
foregoing 22:7
  22:11
form 22:10
formal 3:9 4:8
  15:2,17
four 12:23
further 22:15
fussing 19:8

**G**

Gee 4:10
General 13:6
getting 3:10,13
  8:11

Girard 14:20
girls 17:18 19:1
give 4:23 15:23
go 2:15 3:16 4:8
  4:16,17 6:5 7:5
  8:10 12:9,12
  13:6,9,18,23
  16:3,3 17:22
  18:20 19:18,20
  20:2,5
goes 9:23 10:6
going 3:22 4:17
  6:14 8:4 9:15
  9:16 10:18
  12:17 13:4,19
  18:12 20:7,10
  20:20 21:6
government
  6:10
grabbed 11:9
ground 7:13
grown 8:11

**H**

hand 10:22 12:2
  13:12 15:6
  20:16
handing 11:8
handle 10:18
hands 3:16
happen 11:1
hate 7:16
heard 21:4
help 3:7
helping 11:4
Hey 3:2,6 5:2
  14:5
Hi 4:19
hit 8:23
home 13:19,19
  18:7
Honey 6:7
hope 3:23 6:14
  6:16

| | | | | |
|---|---|---|---|---|
| **hostile** 3:9,13 16:9 | 7:11,17 8:1,10 8:20 9:3,14 | 10:15 11:23 12:5,11,16,22 | **obviously** 15:14 **office** 4:23 5:1 | **play** 10:19 13:4 20:1 |
| **hostility** 16:15 | 10:16,21 11:7 | 13:13 14:7,7 | **Oh** 7:4 | **playing** 13:7 |
| **Huh-uh** 12:15 | 11:12,15,16,16 | 15:1 16:18 | **okay** 1:10,15,19 | **point** 5:9 7:19 |
| **Hutchison** 1:3 | 12:14 13:2,7 | 17:8,13 18:5 | 2:11,17,20 | **population** 3:18 |
| 4:3 7:20 9:2 | 15:10 16:8,8 | 19:17 20:15,19 | 4:10,20 5:2 | **position** 10:5 |
| 11:2,14 12:3 | 16:11,13,23 | 20:22 21:3,9 | 11:2 14:4,22 | **pots** 11:4 |
| 12:10,15 13:11 | | **mean** 3:17 5:8 | 16:10 17:21 | **pound** 12:8 20:5 |
| 13:18 14:2,8 | **L** | 5:10,22 8:7,8 | 18:4 20:17 | **preparing** 19:11 |
| 14:11,14,14,15 | **ladies** 21:5 | 8:15,21 9:8 | **old** 12:16 | **probably** 2:15 |
| 14:17,21 15:7 | **lady** 9:11,20 | 10:12,13,20 | **one-sided** 3:18 | 15:12 20:11 |
| 15:22 16:16 | 19:20 | 11:12 15:14 | **open** 11:5 | **problem** 10:3 |
| 17:2,11,15 | **lady's** 17:14 | 16:21 17:22,23 | **options** 16:8 | 14:23 15:15,16 |
| 18:3,22 19:5 | **large** 12:17 22:6 | 18:13 19:9,10 | **ought** 6:19 | **procedures** 16:6 |
| 19:15 20:9 | 22:22 | **means** 22:8 | **outline** 15:17 | **proceeding** 22:7 |
| | **legal** 10:16 | **meet** 4:15 | | **proceedings** |
| **I** | **line** 8:19,23 | **MEETING** 1:1 | **P** | 22:14 |
| **ignore** 19:14 | 11:20 | **meetings** 9:3 | **pans** 11:4 | **process** 16:4 |
| **inaudible** 6:7 | **listen** 9:7,10,17 | **mentioned** 5:8 | **particular** 19:12 | **produced** 22:9 |
| 7:21 10:9,10 | 17:9,12,18 | 16:23 17:1 | **parties** 22:16 | **profanity** 18:15 |
| 11:17 12:10 | 18:7 19:18 | **menu** 19:12 | **Passmore** 1:2 | **pushover** 7:12 |
| 13:12 17:2,3 | **little** 9:3 16:14 | **mind** 8:19 | 2:13,15 3:2,3,5 | **put** 11:15 13:1 |
| 19:6 | **long** 4:17 17:20 | **minor** 13:14 | 3:6,12,23 4:6 | 17:20 |
| **indicated** 15:19 | **look** 19:21 | **minute** 19:18 | 4:10,18 5:15 | **puts** 10:5 |
| 16:14 21:8 | **lunchroom** 1:21 | **mistreated** | 5:20 6:1,4,20 | **putting** 11:7 |
| **indicating** 11:10 | **Lynne** 9:8 14:8 | 15:20 | 6:23 7:4,9,15 | 12:19 20:2 |
| **interested** 22:17 | 14:11 | **mistreatment** | 7:22 8:6,16,20 | |
| **issue** 12:1 13:14 | | 15:3 | 9:21 10:4,23 | **R** |
| **item** 19:12 | **M** | **months** 3:11 | 11:11,22 12:13 | **racial** 16:15 |
| | **mad** 10:8 18:6 | **morning** 11:18 | 12:20 13:9,16 | **realize** 11:12 |
| **J** | **Mahler** 22:4,21 | **mouth** 6:14 | 13:21 14:4 | **really** 4:15 5:18 |
| **Jeff** 14:6 | **man** 2:6 | | 15:5,9 16:21 | 11:19 |
| **Joy** 1:18 4:20 | **management** | **N** | **pay** 3:1 | **remarks** 18:15 |
| | 10:3 | **nail** 7:14 | **Penny** 2:1,4 3:2 | **Reporter** 22:5 |
| **K** | **manager** 19:7 | **name** 14:5,9,13 | 16:3,13 | **REPORTER'S** |
| **keep** 13:22 19:6 | **manner** 22:17 | 16:3,13 | **people** 3:19 13:5 | 22:1 |
| 19:7 | **ma'am** 14:2 | **need** 1:23 2:12 | 13:22 18:18 | **represents** 22:12 |
| **kettle** 17:20 | **McCart** 1:2,6,10 | 8:12 10:17 | **people's** 12:19 | **result** 22:18 |
| **kin** 22:16 | 1:15,19 2:2,5,8 | 13:22 15:18,23 | 13:1 | **right** 5:6,23 |
| **kind** 3:17 6:12 | 2:11,17,20,23 | 16:2,9 20:11 | **perfect** 18:13 | 10:19 11:5,18 |
| 10:17 11:9 | 3:8,14 4:7,13 | **needs** 3:8 4:7 7:1 | **person** 6:12 | 14:22 15:21 |
| **know** 3:17,21 | 5:11,17,22 6:3 | **neither** 22:15 | **phone** 2:19 | 17:15 18:22 |
| 4:16,20 5:9,14 | 6:18,22 7:2,7 | **never** 11:19 | 10:11 | **right's** 5:23 |
| 5:18,20,23 6:3 | 7:11,18 8:3,13 | **news** 13:5 | **place** 16:6 | **rude** 5:10,12 |
| 6:4,7,9,10 7:4 | 8:18,21 9:6,22 | | | |
| | | **O** | | |

# FREEDOM COURT REPORTING

**rug** 3:21
**rules** 9:19
**run** 8:21

### S

**Sara** 22:4,21
**saw** 20:16
**saying** 12:4
  15:10 18:12
  19:4
**school** 1:20
**schools** 1:12
**seat** 2:22 3:7
**second** 14:16,18
**secretary** 1:8,13
  1:17,18,22 2:4
  2:7,9,14,18,21
  3:4 4:1
**see** 4:22 5:22
  13:9 16:18,19
  16:22 20:9
**seen** 12:18
**sets** 9:20
**shake** 13:8
**shame** 6:6
**Shorthand** 22:4
**show** 13:3 15:5
**significant** 17:6
**sir** 14:18 18:3
  21:2,10
**sit** 12:23
**situation** 18:1
**situations** 16:5
**snatch** 12:1
**snatched** 10:22
**snatching** 3:15
  13:15
**somebody** 4:21
  5:5 7:7 8:15,18
**somebody's** 9:16
  10:1
**Sorry** 5:2
**South** 14:20
**spank** 7:5

**specific** 15:18
  16:1
**specifics** 16:9
**spoke** 15:9
**stand** 7:13
**start** 19:6
**State** 22:2,5,21
**stay** 8:19
**stealing** 20:4
**stenographic**
  22:8
**step** 5:3
**stick** 15:11
**stink** 13:3
**stir** 13:3,3,8
**stop** 10:18
**strange** 10:5
**stuff** 1:21 3:15
  4:16 12:6,6,8
  12:11 13:2,15
  20:4
**sugar** 12:6 20:6
**suggest** 15:16
  20:12,14
**superintendent**
  1:7 4:14
**supervision** 8:14
  22:11
**supervisor**
  17:23 18:2,21
  19:13
**supervisor's**
  18:9
**support** 20:13
  20:15
**supposed** 9:10
  9:18
**sweeping** 3:21

### T

**take** 8:9 10:20
  10:21,21 13:19
  18:17
**taken** 22:7

**talk** 1:14,23 2:1
  2:13 4:4 5:6
**talked** 2:6 15:7
**talking** 4:18
**TAPE** 1:1
**telephone** 4:19
**tell** 17:22 19:19
**telling** 6:14 9:11
  9:18 10:1 18:8
  18:9 19:22,23
**tells** 9:8 10:6,7
  18:21,23 19:13
**Thank** 5:6
**thing** 6:8 10:22
**things** 9:13 18:16
**think** 15:19 21:9
**threatening**
  18:15
**times** 11:14
**today** 3:15 5:7
  5:16 10:21
  11:3 20:20
**told** 4:1 5:12,15
  6:6 7:23 9:2
  10:20 12:2
  16:14 17:16
  18:2 19:7
**tolerate** 18:20
**tooth** 7:13
**touch** 1:7 2:3
  18:14
**transcript** 22:10
  22:13
**TRANSCRIP...**
  1:1
**transfer** 5:16
  6:2
**transferred** 5:19
  15:11
**trays** 13:1
**treat** 6:16,17
**treated** 6:21
**treating** 3:19
**treatment** 3:10

3:13 15:2 21:4
**tries** 9:19
**trucks** 12:19
**true** 22:13
**truth** 6:15
**try** 5:13
**trying** 10:10
  13:12
**turn** 19:1,10
**turned** 8:3,7
**twenty-five** 8:22
  12:8 20:5

### U

**Uh-huh** 3:14 4:6
  9:21 11:22
  14:21 15:22
**understand** 5:11
**untold** 12:12
**upset** 7:16
**use** 18:14,15
**utensils** 11:7

### V

**verbally** 18:19

### W

**waiting** 4:22 5:5
  12:21,22
**walked** 8:23
**want** 1:14 2:1
  6:7,8,9,21 9:7
  9:7,10,17
  10:15 13:2,7
  15:15 17:9,13
  18:14 20:7
**wanted** 8:1
**wanting** 10:8
**wants** 15:1 20:5
**washing** 11:4
**watched** 12:23
**way** 2:12 6:16
  6:18,20 7:1,3
  8:4,7,8 9:13
  10:2,2,8 11:9

17:17,19 18:1
  18:9,10,23
  19:2,6,13,19
  19:22,23
**we'll** 13:8 16:7,8
**We've** 17:5
**woman** 9:18
**work** 6:9 7:23
  15:3
**working** 7:10
  17:4 18:13
**wouldn't** 8:4
**write** 15:17 16:2
**wrong** 5:23,23

### Y

**Yeah** 1:22 2:8
  7:15 12:3
**year** 14:16,18
  15:12 17:5,5
**years** 8:22 14:19
**yesterday** 17:16
**y'all** 11:1

PHENIX CITY BOARD OF EDUCATION
PUBLIC SCHOOL CONTRACT

FOR THE

SCHOLASTIC YEAR 2004 - 2005

STATE OF ALABAMA
RUSSELL COUNTY

THIS CONTRACT ENTERED INTO IN DUPLICATE BETWEEN THE PHENIX CITY BOARD
OF EDUCATION, HEREINAFTER REFERRED TO AS EMPLOYER, AND ELIZABETH L HUTCHISON,
HERINAFTER REFERRED TO AS EMPLOYEE.

WITNESSETH:

1.  THAT THE EMPLOYER HEREBY CONTRACTS WITH THE EMPLOYEE, AS CNP WORKER
    IN AND FOR SAID CITY FOR A MINIMUM TERM OF 182 DAYS FOR THE SCHOLASTIC
    YEAR 2004 - 2005 AT AN ANNUAL SALARY OF $11,075.00.

2.  THAT THE EMPLOYEE CERTIFIES THAT SHE POSSESSES THE EDUCATION AND SKILLS
    REQUIRED FOR SAID POSITION AND IS LEGALLY QUALIFIED AND PROPERLY CERTIFIED
    FOR SAID POSITION. (IF POSITION REQUIRES CERTIFICATION, THE CERTIFICATE OF
    SUCH CERTIFICATION MUST BE ON FILE IN THE OFFICE OF THE SUPERINTENDENT NO
    LATER THAN THE SECOND PAY PERIOD TO ENTITLE EMPLOYEE TO PAYMENT.) EMPLOYEE
    FURTHER AGREES TO BE BOUND BY AND COMPLY WITH THE APPLICABLE FEDERAL AND
    STATE LAWS AND THE RULES, REGULATIONS AND POLICIES OF THE PHENIX CITY BOARD
    OF EDUCATION.

3.  THE ANNUAL SALARY SHALL BE DECREASED ON A PRO RATA BASIS FOR THE NUMBER OF
    DAYS THE EMPLOYEE DOES NOT WORK DURING THE CONTRACT PERIOD BECAUSE OF
    EMPLOYMENT SUBSEQUENT TO COMMENCEMENT OF THE SCHOOL YEAR; RESIGNATION;
    TERMINATION IN COMPLIANCE WITH THE LAWS OF THE STATE OF ALABAMA; OR
    EMPLOYEE'S ABSENCES NOT COVERED BY ACCUMULATED LEAVE.

4.  THIS CONTRACT BECOMES EFFECTIVE UPON EMPLOYEE'S COMPLETING ALL
    REQUIREMENTS FOR JOB CLASSIFICATION; SIGNATURES OF THE PARTIES HERETO; AND
    THE APPROVAL OF THE PHENIX CITY BOARD OF EDUCATION. IF EMPLOYMENT OF
    EMPLOYEE IS CONTINGENT UPON RECEIPT BY EMPLOYER OF FEDERAL FUNDS, THE
    EFFECTIVENESS OF THIS CONTRACT IS FURTHER CONTINGENT UPON SUCH RECEIPT.

5.  IT IS UNDERSTOOD AND AGREED THAT EMPLOYEE AGREES TO COMPLY WITH ALL DUTIES
    DESIGNATED BY THE PRINCIPAL OF EMPLOYEE'S LOCATION AND THE SUPERINTENDENT.
    EMPLOYEE SHALL FAITHFULLY AND FULLY PERFORM SAID DUTIES ACCORDING TO THE
    STANDARDS OF CONDUCT AND PERFORMANCE ESTABLISHED FOR SAID POSITION.
    EMPLOYEE'S FAILURE TO SO PERFORM WILL CONSTITUTE A BREACH OF THIS CONTRACT
    AND CAUSE FOR DISMISSAL, AND EMPLOYMENT WILL BE TERMINATED PURSUANT TO THE
    LAWS OF THE STATE OF ALABAMA.

6.  THIS CONTRACT IS GOVERNED BY THE LAWS OF THE STATE OF ALABAMA, AND RELEVANT
    FEDERAL LAWS IN EFFECT AT EXECUTION AND FOR THE DURATION OF THIS
    CONTRACT ARE INCORPORATED HEREIN AND MADE A PART HEREOF.

**PLAINTIFF'S EXHIBIT**

APPROVED BY DIRECTION OF THE PHENIX CITY BOARD OF EDUCATION

_____5/14/04_____          BY_____          //
DATE                           SUPERINTENDENT OF SCHOOLS

_____5/17/04_____          _____Elizabeth L Hutchison_____
DATE                           EMPLOYEE

# PHENIX CITY PUBLIC SCHOOLS - CLASSIFIED PERSONNEL EVALUATION FORM

Name: *Elizabeth Hutchison*  Position: *CNP South Girard*  School: ____  Period Covered From: 3-1 *08/03* To: 3/12

## EVALUATION FACTORS

| | Satisfactory | Needs Improvement | Unsatisfactory |
|---|:---:|:---:|:---:|
| **a. QUALITY OF WORK** *(Accuracy, neatness, completeness and thoroughness of work performed)* | ✓ | | |
| **b. QUANTITY OF WORK** *(The amount and promptness of satisfactory work completed)* | ✓ | | |
| **c. INTEREST** *(Employee's adaptability, attitude and willingness)* | ✓ | | |
| **d. ATTENDANCE AND PUNCTUALITY** *(Use of leave; time of arrival and departure)* | ✓ | | |
| **e. RESPONSIBILITY AND DEPENDABILITY** *(In absence of supervision)* | ✓ | | |
| **f. USE OF TIME** *(Planning of work, offering assistance to others, etc.)* | ✓ | | |
| **g. COOPERATION** *(Consideration of other employee's work, working with others, etc.)* | ✓ | | |
| **h. INITIATIVE** *(Amount of guidance required, resourcefulness and procedures)* | ✓ | | |
| **i. PERSONAL QUALITIES** *(Manifests tact, neatness in dress, self-control, patience, etc.)* | ✓ | | |
| **j. PUBLIC RELATIONS** *(Courteous: Answering telephone, greeting visitors, supplying correct information, etc.)* | ✓ | | |
| **k. ACCEPTANCE OF CONSTRUCTIVE CRITICISM** | ✓ | | |
| **l. KNOWLEDGE OF POSITION** *(Extent to which the employee knows the "What", "How" and "Why" of the job)* | ✓ | | |
| **m. CONFIDENTIAL INFORMATION** *(Can be trusted with information necessary to do the job)* | ✓ | | |
| **n. SUPERVISORY SKILLS** *(Management of the work of those under supervision)* | ✓ | | |
| **o. ATTITUDE** *(Projects positive image concerning job tasks)* | ✓ | | |
| **p. PROFESSIONAL DEVELOPMENT** *(Participates in related training activities)* | ✓ | | |

**Comments and recommendations for improvement must accompany areas marked needs improvement and unsatisfactory.**

Commendations _____

_____

Deficiencies _____

_____

Recommendations for Improvement _____

Employee's Comments _____

_____

Employee's Signature _____ Date _____

**PLAINTIFF'S EXHIBIT**

5

Your signature indicates that you have seen this evaluation and it has been discussed with you. It does not necessarily indicate that you agree with the evaluation.

Supervisor's Signature *Beverly Walker* *Penny Passmore* Date *3-12-04*

This employee is completing the three year probationary period (calendar year).

I recommend non-probationary status. Yes____ No____

Principal's Signature *R. Span* Date *3/16/04*

PROFESSIONAL CLASSIFIED SERVICES

DEFENDANT'S
EXHIBIT
12

To:        Mr. C. Jeff Adams, Assistant Superintendent

From:      Reginald Sparks, Principal
           South Girard School

Subject:   Employment Recommendation Based on Performance Appraisal

Reference:

           HUTCHISON ELIZABETH L
           1614 28TH AVENUE
           PHENIX CITY           AL    36870

This is to certify that the above named employee of the Phenix City Board of Education has been under my direct supervision during the 2003-2004 school year.  Based on my personal observation of this person's job performance and all other factors related to job effectiveness and/or success, the following employment recommendation is made:

   ( () )   I recommend this employee's re-employment for the 2004-2005
            school year.

   (  )     I recommend, with reservations outlined on the reverse side of this document,
            this employee's re-employment for the 2004-2005 school year.

   (  )     I do not recommend this employee's employment beyond the current
            contract period.

I affirm that appropriate evaluations were made regarding the effectiveness of this employee; that copies of all written evaluations have been acknowledged by the employee and are being placed in the personnel file; and that this recommendation is consistent with these evaluations.

_____          _____
Signature                                  Date Signed    4/5/04

The Board of Education declares that no person in the school district shall, on the basis of age, race, color, creed, handicap, religion, national origin, sex, or similar personal distraction, be excluded from participation in, be denied the benefits of, or be subject to discrimination in regard to employment, retention, promotion, transfer, or dismissal in any educational program or activity under the jurisdiction of the Board.

PLAINTIFF'S
EXHIBIT
9

# PHENIX CITY PUBLIC SCHOOLS - CLASSIFIED PERSONNEL EVALUATION FORM

| Name | Position | School | Period Covered | |
|------|----------|--------|----------------|--|
| *Elizabeth Hutchison* | *C/W Worker* | *South Girard* | From: | To: |

| EVALUATION FACTORS | Satisfactory | Needs Improvement | Unsatisfactory |
|--------------------|:------------:|:-----------------:|:--------------:|
| **a.** QUALITY OF WORK *(Accuracy, neatness, completeness and thoroughness of work performed)* | ✓ | | |
| **b.** QUANTITY OF WORK *(The amount and promptness of satisfactory work completed)* | ✓ | | |
| **c.** INTEREST *(Employee's adaptability, attitude and willingness)* | ✓ | | |
| **d.** ATTENDANCE AND PUNCTUALITY *(Use of leave; time of arrival and departure)* | ✓ | | |
| **e.** RESPONSIBILITY AND DEPENDABILITY *(In absence of supervision)* | ✓ | | |
| **f.** USE OF TIME *(Planning of work, offering assistance to others, etc.)* | ✓ | | |
| **g.** COOPERATION *(Consideration of other employee's work, working with others, etc.)* | ✓ | | |
| **h.** INITIATIVE *(Amount of guidance required, resourcefulness and procedures)* | ✓ | | |
| **i.** PERSONAL QUALITIES *(Manifests tact, neatness in dress, self-control, patience, etc.)* | ✓ | | |
| **j.** PUBLIC RELATIONS *(Courteous: Answering telephone, greeting visitors, supplying correct information, etc.)* | ✓ | | |
| **k.** ACCEPTANCE OF CONSTRUCTIVE CRITICISM | | ✓ | |
| **l.** KNOWLEDGE OF POSITION *(Extent to which the employee knows the "What", "How" and "Why" of the job)* | ✓ | | |
| **m.** CONFIDENTIAL INFORMATION *(Can be trusted with information necessary to do the job)* | ✓ | | |
| **n.** SUPERVISORY SKILLS *(Management of the work of those under supervision)* | ✓ | | |
| **o.** ATTITUDE *(Projects positive image concerning job tasks)* | ✓ | | |
| **p.** PROFESSIONAL DEVELOPMENT *(Participates in related training activities)* | ✓ | | |

**Comments and recommendations for improvement must accompany areas marked needs improvement and unsatisfactory.**

Commendations _____

Deficiencies _____

Recommendations for Improvement *Needs to work on people skills.*

Employee's Comments _____

Employee's Signature *Elizabeth L. Hutchison* _____ Date _____

Your signature indicates that you have seen this evaluation and it has been discussed with you. It does not necessarily indicate that you agree with the evaluation.

Supervisor's Signature *Penny Passmore, Brenda Russell* Date *4/25/05*

This employee is completing the three year probationary period (calendar year).

I recommend non-probationary status. Yes_____ No_____

Principal's Signature _____ Date _____

PLAINTIFF'S EXHIBIT

2

# Phenix City Public Schools

### Educational Services Center
### P. O. Box 460
### Phenix City, Alabama 36868-0460

**May 20, 2005**

Office Of Superintendent
Telephone (334) 298-0534

1212 Ninth Avenue
Fax (334) 298-2674

## M E M O R A N D U M

TO:   Ms. Elizabeth L. Hutchison
     1614 28th Avenue
     Phenix City, Alabama 36870

FROM:  Brenda H. Dorrill, Employee Benefits Coordinator

SUBJECT: Termination of Employment Information

Please look over the information listed below. If you have any questions, please call the Payroll/Benefits Office at (334) 298-0576.

Date of Last Payroll Check to be Issued:   **August 31, 2005**

Medical Insurance will be Effective Through:  **August 31, 2005**

PEEHIP will forward COBRA information to you.

Other deductions you have:

   PEEHIP Medical insurance in the amount of $ 2.00.

Information concerning your retirement account is enclosed.

Thank you.

/bd
Enclosure
cc:  File

**PLAINTIFF'S EXHIBIT**

14

## PROFESSIONAL CLASSIFIED SERVICES

To:        Dr. Larry E. DiChiara, Superintendent

From:      Reginald Sparks, Principal
           South Girard School

Subject:   Employment Recommendation Based on Performance Appraisal

Reference:
           HUTCHISON ELIZABETH L
           1614 28TH AVENUE
           PHENIX CITY        AL    36870

This is to certify that the above named employee of the Phenix City Board of Education has been under my direct supervision during the 2004-2005 school year. Based on my personal observation of this person's job performance and all other factors related to job effectiveness and/or success, the following employment recommendation is made:

( )    I recommend this employee's re-employment for the 2005-2006 school year.

( )    I recommend, with reservations outlined on the reverse side of this document, this employee's re-employment for the 2005-2006 school year.

(✓)    I do not recommend this employee's employment beyond the current contract period.

I affirm that appropriate evaluations were made regarding the effectiveness of this employee; that copies of all written evaluations have been acknowledged by the employee and are being placed in the personnel file; and that this recommendation is consistent with these evaluations.

Signature _____          Date Signed  4/19/05

The Board of Education declares that no person in the school district shall, on the basis of age, race, color, creed, handicap, religion, national origin, sex, or similar personal distraction, be excluded from participation in, be denied the benefits of, or be subject to discrimination in regard to employment, retention, promotion, transfer, or dismissal in any educational program or activity under the jurisdiction of the Board.

**PLAINTIFF'S EXHIBIT**

/0

# Phenix City Public Schools

### Educational Services Center
### P. O. Box 460
### Phenix City, Alabama 36868-0460

**Office Of Superintendent**
**Telephone (334) 298-0534**

1212 Ninth Avenue
Fax (334) 298-2674

May 13, 2005

Certified Mail

Ms. Elizabeth L. Hutchison
1614 28th Ave.
Phenix City, AL 36870

Dear Ms. Hutchison:

This is to advise you that the Phenix City Board of Education, meeting in official session on May 12, 2005, voted not to renew your contract. Therefore, you will not be employed by the Phenix City Board of Education for the 2005-2006 school year. Your current contract expires as of May 19, 2005.

Thank you for your service to the students of the Phenix City Public Schools.

Sincerely yours,

C. Jeff Adams
Assistant Superintendent

CJA:ja

pc.    Reginald Sparks, Principal
Brenda Dorrill, Benefits Coordinator
Personnel File

**PLAINTIFF'S EXHIBIT**

12

FILE: GAE

## SEXUAL HARASSMENT

The Phenix City Board of Education will not permit sexual harassment in the work place.

The Phenix City Board of Education is committed to providing a working environment that is free of sexual harassment and will utilize all available resources to deter such conduct.

1.    **Sexual Harassment Defined**

Sexual harassment is defined as unwelcome sexual advances, request for sexual favors and any other physical, verbal, or visual conduct of a sexual nature when:

1.    Submission to the conduct is an explicit or implicit term or condition of employment, continued employment or advancement; or

2.    Submission to or rejection of the conduct is used as a basis for employment decisions affecting such individuals; or

3.    Such conduct has the purpose of or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.





FILE: GAE

2.    <u>Prohibitions</u>

1.    Conduct of a sexual nature may include but is not limited to verbal or physical sexual advances, including subtle pressure for sexual activity; suggestive remarks; vulgar or sexually explicit comments, gestures or conduct; sexual innuendo; touching, pinching, patting, or brushing against; comments regarding physical or personality characteristics of a sexual nature; and sexually-oriented "kidding", "teasing", double-entendres, and jokes. Written sexually suggestive or obscene letters, notes or invitations are also examples of acts of sexual harassment.

2.    Verbal or physical conduct of a sexual nature may constitute sexual harassment when the allegedly harassed employee has indicated, by his or her conduct, that it is unwelcome.

3.    Visual, sexually oriented gestures, display of suggestive or derogatory objects, pictures, magazines, cartoon's or posters are acts of sexual harassment.

4.    In third party situations, sexual harassment may also be present if one individual is offended by the sexual interaction, conduct, or communications between others.

5.    An employee who has initially welcomed such conduct by active participation must give specific written notice to the alleged harasser that such conduct is no longer welcome in order for any such subsequent conduct to be deemed unwelcome.

FILE: GAE

3.    **Responsibilities**

All individuals in administrative, supervisory and management positions are responsible for maintaining a workplace free of sexual harassment and intimidation. In this role, the responsibilities of all administrators, supervisors and managers include but are not limited to the following:

1.    Discuss this policy in detail with their employees and assure that all of them are aware that they can work in an environment of dignity and respect.

2.    Assure employees that they are not required to endure insulting, degrading or exploitative sexual treatment and inform them of the complaint process, including their right to by-pass an offending supervisor and complain to other officials or managers.

3.    Immediately report any complaints concerning sexual harassment received from employees to the Administrative Assistant for Personnel or to the Superintendent.

4.    **Reporting, Investigation and Sanctions**

It is the express policy of the Board of Education to encourage victims of sexual harassment to come forward with such claims.

1.    Employees are urged to report in writing any unwelcome conduct of a sexual nature which is considered to be sexual harassment by supervisors or fellow employees to the Administrative Assistant for Personnel. If the Administrative Assistant for Personnel is the offending person, the report shall be made to the Superintendent of Schools;. In the event that the employee feels unable to report the alleged incident to the Administrative Assistant for Personnel or the Superintendent, the complaint will be received and investigated by another person of the same sex designated by the Superintendent.

Phenix City

File: GAE / Page 6 of 9

FILE: GAE

2.    Confidentiality will be maintained to the extent possible but cannot be guaranteed. No reprisals or retaliation will be allowed to occur as a result of the good faith reporting of charges of sexual harassment. The employee making a good faith report may request that another administrator or supervisor be appointed by the Superintendent to conduct his/her formal evaluation process.

3.    In determining whether alleged conduct constitutes sexual harassment, the totality of the circumstances, the nature of the conduct, and the context in which the alleged conduct occurred will be investigated. The Administrative Assistant for Personnel has the responsibility of investigating and resolving complaints of sexual harassment on a case by case basis.

4.    After receiving a written statement, the Administration will promptly and thoroughly investigate all harassment complaints within thirty (30) days. The complainant will be kept informed throughout the process. If, after a thorough investigation, it is determined that harassment has occurred, immediate and appropriate corrective and disciplinary action will be taken to end the harassment.

      Discipline will also be enforced against supervisory and management personnel who knowingly allow such behavior to continue. Appropriate follow-up will be taken to ensure that the harassment has stopped.

5.    Any employee found to have engaged in sexual harassment shall be subject to sanctions, including, but not limited to verbal warning, letter of reprimand, suspension, or termination subject to applicable procedural requirements.

6.    A copy of this policy will be made available to all employees.
      Please direct any questions regarding this policy to:
            Administrative Assistant for Personnel
            Phenix City Board of Education
            P.O. Box 460
            Phenix City, AL 36868-0460

## NON-PROBATIONARY   STATUS

The Board shall grant non-probationary   status to bus drivers, cafeteria workers, custodians, secretaries, clerical assistants, supervisors  and all other persons not certified by the State Board of Education who are employed full-time by the Board and who have successfully served a probationary term of three years from the date of initial employment.  Full time employees include adult bus drivers and other employees whose duties require working twenty or more hours in each normal working week of the school term. Substitute teachers and other substitute employees are not covered by this policy.  The Board may remove an employee during the employee's probationary  period by furnishing the employee written notification at least fifteen (15) days prior to the effective date of termination.  Said notification shall be sent by certified or registered mail, return requested to the employee's current address as listed in the Board's personnel file.  It shall be the responsibility of the employee to assure currency of an employee's address.

Upon successfully completing the probationary  period, said employee shall be deemed to be employed on a non-probationary  status. Termination of an employee on a non-probationary  status shall only be undertaken for the reasons and in accordance with the procedures outlined in state statutes.

During the probationary  period of employment each employee to whom this policy applies will be evaluated.


Ref:  Ala. Code 36-26-100  to 36-26-104.


Phenix City


**EXHIBIT   G**

FILE: GBM

## TRANSFER

**Voluntary**

The Board may grant a requested transfer if the employee so requesting possesses the required qualifications for the desired position and if a vacancy in such position exists. All requests for voluntary transfers shall be carefully considered and reviewed on a nondiscriminatory basis.

**Involuntary**

The Board may transfer any teacher, including personnel employed as principals and supervisors, upon the recommendation of the Superintendent, for any succeeding year, from one position, school or grade to another by giving written notice to the teacher of such intention to transfer. Such transfer shall be without loss of status or violation of contract and shall not be for political or personal reasons. The Board may transfer any teacher only in accordance with Chapter 24, of Title 16 of the Code of Alabama. A teacher being involuntarily transferred must be notified by July 1 of the transfer.

Ref: Ala. Code 16-9-23, 16-12-16, 16-24-1, 16-24-5 to -7.

Phenix City

EXHIBIT  1

## EQUAL OPPORTUNITY EMPLOYMENT

The Board of Education declares that no person in the school district shall, on the basis of age, race, color, creed, handicap, religion, national origin, sex, or similar personal distinction, be excluded from participation in, be denied the benefits of, or be subject to discrimination in regard to employment, retention, promotion, transfer, or dismissal in any educational program or activity under the jurisdiction of the Board.

The Superintendent and/or his representative shall investigate all complaints which may be brought against any individual school in the school district in regard to any alleged discriminatory action for appropriate treatment by the Board.

Ref:    U. S. Const. Amend. XIV, 1; 42 U. S. C. 20003-1 to 1-17; 20 U.S.C. 1681 et. seq; 29 U.S.C. 794; 29 U.S.C. 621 et. seq;

Phenix City

EXHIBIT  H

FILE: GBK

## SUSPENSION

The Board of Education authorizes the Superintendent to suspend a teacher on continuing service status, if he so chooses, pending a hearing on proposed cancellation of the teacher's contract. Teachers on continuing service status may be suspended for the following reasons: incompetency, insubordination, immorality, neglect of duty, justifiable decrease in the number of teaching positions, or other good and just cause but suspension cannot be made for political or personal reasons. Teachers on suspension who are subsequently dismissed as a result of said hearing, shall not receive compensation for the period of such suspension.

The Superintendent shall have authority to temporarily suspend school personnel, other than teachers on continuing service status when circumstances dictate. Charges for the suspension shall be stated in writing, and the employee so charged shall be given an opportunity to be fully and impartially heard by the Board upon not less than ten days written notice. Notice of the charges against him and the opportunity for a hearing shall be served upon the employee by registered mail within five days of the presentation of the charges to the Board. The hearing may be held at the next regular meeting of the Board or at a special meeting called for that purpose.

The superintendent may, when particularly sensitive circumstances exist and with the concurrance of the employee, grant up to five days of administrative leave to complete an investigation of alleged wrong doing. This leave shall be "with pay."

Phenix City

**EXHIBIT J**

FILE: GAE

## COMPLAINTS AND GRIEVANCES

The Board recognizes that harmonious relations with its employees can be maintained and improved through effective communications. The interest of all parties can best be served by sincere efforts of all concerned to promote understanding and cooperation. The Board, therefore, has adopted the following grievance procedure as a means to examine and resolve possible problems which relate to the administration of personnel policies of the School District.

I    Definitions

1.    "Grievance" is a claim or dispute concerning the interpretation, application, or claimed violation of the personnel policies of the School District. Other matters for which other means of resolution are provided or foreclosed by statute or administrative procedures shall not be considered grievances. A grievance does not include matters involving the Board's right to establish educational policy and prescribe rules and regulations for the conduct and management of the Schools.

2.    Employees covered by this procedure shall mean permanent employees of the Board.

3.    Immediate Supervisor is that employee possessing administrative authority to direct the activities of the grievant.

File: GAE / Page 1 of 9



PLAINTIFF'S EXHIBIT
6

EXHIBIT. K

FILE: GAE

II    Procedure. All grievances shall be handled in accordance with the following procedure.

1.    Step 1. Any employee shall promptly present to the employee's immediate supervisor, the grievance in writing on Board prescribed forms. Such notice shall be presented no later than five (5) working days after the date on which the alleged grievance occurred. The employee and his immediate supervisor shall attempt to resolve the grievance. The immediate supervisor shall make a proper disposition of the grievance and shall reply to the employee in writing on Board prescribed forms within five (5) working days following the date of submission.  If the grievance is not submitted within the time prescribed, the employee shall be deemed not to have any further right with respect to said grievance.

2.    Step 2. In the event the employee wishes to appeal the decision at Step 1, the appeal must be presented in writing on forms prescribed by the Board, to an administrative officer of higher rank than the employee's immediate supervisor. Such appeal shall be presented within five (5) working days of the receipt of the Step 1 decision.

    Such an appeal shall contain a statement of the grievance and specific references to the section of the District's personnel policies which        the employee claims to have been violated. The Administrative officer shall schedule a meeting with the employee as promptly as is reasonably possible to attempt to resolve the grievance. At this conference, the employee may appear alone or may be accompanied by a fellow employee of his choice. Notice of the conference shall also be given to all parties involved in the alleged grievance. The administrative officer shall issue a written decision to the employee within five (5) working days after the conference. Unless the grievance shall be so appealed, it shall be deemed to have been settled and the employee shall have no further right with respect to said grievance.

3.    Step 3. In the event the employee wishes to appeal the decision at Step 2, the appeal must be presented to the Superintendent in writing on forms prescribed by the Board within five (5) working days of the receipt of the Step 2 decision. A copy of the Step 3 appeal, together with Step 1 and Step 2 decisions and the name of the accompanying fellow employee. if any, must simultaneously be submitted to the Superintendent. The Superintendent shall schedule a meeting with the employee within ten (10) working days to attempt to resolve the grievance.  Notice of the Step 3 conference shall be

FILE: GAE

given to the employee, as well as to the individuals who rendered the Step 1 and Step 2 decisions. The Superintendent shall issue a written decision within ten (10) working days after the conference with the employee.

Unless the grievance shall be so appealed, it shall be deemed to have been settled and the employee shall have no further right with respect to said grievance.

4.     Step 4. In the event the employee wishes to appeal the decision at Step 3, the appeal must be presented to the Superintendent as Secretary of the Board within five (5) working days of the receipt of the Step 3 decision. A copy of the Step 4 appeal, together with copies of the grievance, the Step 1, Step 2, and Step 3 decision, and the name of the representative of the employee, if any, must simultaneously be submitted to the Superintendent. The employee's appearance to present his appeal before the Board will be scheduled in accordance with regular procedures adopted by the Board. The employee may appear alone at this conference or be accompanied by counsel of his own choice. The Board shall issue a written decision within thirty (30) days after the conference with the employee.

# PC school plan sparks resegregation fears

## Superintendent says having two middle schools would slow white flight from system

**By JERRY F. RUTLEDGE**
*Staff Writer*

Charges that a resegregation of the Phenix City's schools would result from a proposed reorganization of

middle and elementary schools were aired Thursday after the Phenix City School Board failed to address the issue at a called meeting.

The 11:30 a.m. meeting never actually got off the ground, with board

President Eddie Lowe balking at calling the meeting to order.

The resegregation fears arise a week after a U.S. District Court judge declared the system unitary, signaling an apparent fissure on the school board and in the community over the

*See* **PHENIX, Page 3**

"Looks like they are putting all blacks in one school and all whites in one school.

We're not going to have that."

**Arthur Sumbry,** *Phenix City councilman*

PLAINTIFF'S EXHIBIT

DGER-ENQUIRER                                                www.ledger-enquirer.com/news    **3**

# PHENIX | Proposal moves fifth grade back to elementary schools

*From Page 1*

future direction of its schools.

"We just celebrated the life of Rosa Parks and a day later we're talking about segregating the school system again with two junior high schools," said the Rev. Noble Williams, pastor of Greater Mount Zion Baptist Church in Phenix City. "The unity of the city is at issue."

The midday meeting became a non-meeting after Lowe read a statement questioning its need and propriety, then refused to call it into order.

After board attorney Sydney Smith could find no parliamentary or legal remedy within the board's policy, Roberts Rules of Order or the new Alabama Open Meetings Act, the group disbanded, sending home a standing room only crowd of parents, community leaders and school administrators.

"A board president could hold a meeting hostage by simply refusing to open it," said superintendent Larry DiChiara. "We will find out what is legal, what the law says. We'll vote on the plan — just not today."

The meeting was called by DiChiara for the purpose of voting on two agenda items — the reorganization plan and the construction of a classroom addition to Westview Elementary.

The reorganization plan has proved controversial. It would return the fifth grade to Phenix City's six elementary schools while establishing South Girard and Phenix City Intermediate as neighborhood



**Sumbry**

middle schools — one in the south and the other in the north. Each middle school would be fed by three neighborhood elementary school.

The middle schools in question would each have magnet programs to attract students from throughout the city. South Girard would have a fine arts magnet and intermediate school, a NASA Explorer School, would continue with its science emphasis.

But leaders of the city's African-American community are concerned that the plan placing students into two middle schools with different racial majorities would result in resegregation.

City Councilman Arthur Sumbry, attending the meeting as a leader of the Phenix City-Russell County Betterment Association, said the plan would separate the students racially.

"Looks like they are putting all blacks in one school and all whites in one school," Sumbry said. "We're not going to have that." He said black community leaders would meet this weekend to decide their next move.

But DiChiara disagrees, saying he believes the reorganization plan would slow the gradual withdrawal of white students from the school system, and even prevent the possibility that 10 years down the road, the school system could become an all-black system.

"There's just no doubt it will slow down the decline of whites," said DiChiara. "The



**DiChiara**

one thing the minority in the South Girard area fears, if that school becomes more predominantly black . . . is they may lose when it comes to resources and personnel. What I don't think they realize is, if we don't do something — if those white numbers continue to decline — they will look up in 10 years and it will be an all-black school system. If my proposal goes through, there's a good chance that will never happen. It might stop that decline and even reverse it."

The school district mailed about 4,000 surveys to parents and people in the community asking whether they favor a reorganization plan for the schools proposed by the superintendent. Results show that 524 respondents were in favor and 211 opposed. But the forms did not require names and did not ask the race of the person or persons responding.

DiChiara said there's no doubt that word on the street in some parts of town is that the reorganization plan is designed to resegregate the schools.

"This is so far from the truth," he said. "We have some schools without an empty classroom. South Girard doesn't have an empty classroom. The intermediate school has the most space. By simply shifting grades around, we now would have a school we can move kids to."

*Staff Writer Harry Franklin contributed to this report.*

"... if we don't do something – if those white numbers continue to decline – they will look up in 10 years and it will be an all-black school system."

**Larry DiChiara,** *Phenix City school superintendent*

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

In Re: Elizabeth Lynn Hutchinsom – Charging Party
     Phenix City Board of Education – Respondent
     Claim No. 130 2006 00502

### POSITION STATEMENT OF PHENIX CITY BOARD OF EDUCATION

February 7, 2006

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Debra B. Leo
ADR Coordinator
EEOC
Birmingham District Office
Ridge Park Place
1130 22nd Street, South
Birmingham, AL  35205

Re: EEOC claim number 130-2006-00502

Dear Ms. Leo:

This letter constitutes the response of the Phenix City Board of Education ("Respondent") to the above-referenced complaint of discrimination filed by Elizabeth Hutchinson ("Charging Party"). Respondent denies that Charging Party was discriminated against or harassed because of her race, or that she was terminated because of her race. To the contrary, Charging Party never complained about any harassment because of her race, and she was terminated for poor people skills; inability to get along with fellow employees; and constant complaining but refusing to allow the Management to bring in other employees to discuss Charging Party's complaints with them.

### I.     Introduction

Respondent is engaged in the business of operating a public school system for the school age children of Phenix City, Alabama. Respondent hired Charging Party as a Child Nutrition Program Worker on July 30, 2003 to work 7.75 hours per day until May 19, 2004. This was the 2003-2004 Scholastic Year. Charging Party was rehired for the 2004-2005 Scholastic Year.  As a Child Nutrition Program Worker, Charging Party was responsible for kitchen set up; meal preparations; serving of meals; kitchen clean up and other duties normally performed in the operation of a lunchroom program for students. Charging Party was employed at South Girard



**PLAINTIFF'S EXHIBIT**
*4*

**EXHIBIT A**

Junior High School. The contract of Charging Party was not renewed on May 12, 2005 and her current contract expired on May 19, 2005. Charging Party was a "classified employee" under Alabama law and had not worked the requisite 3 years to obtain "continuing service status." Therefore, her contract was subject to being non-renewed at its expiration "without cause." There was no legal requirement that a reason for the non-renewal be given and none was given to Charging Party.

## II.    Charging Party's Employment with Respondent

Charging Party performed as a lunchroom worker for both years of her employment even though she may have been assigned to different tasks at different times.

During her first year of employment she was supervised by Beverly Walker, Lunchroom Manager, a black female, who retired at the end of the 2003-2004 Scholastic Year. The Assistant Lunchroom Manager under Mrs. Walker was a black female. Mrs. Walker was sick during this school year and there was very little supervision of the lunchroom staff. The staff had a great deal of freedom to do or not do their assigned tasks and to basically discipline themselves. During that school year, Charging Party was one of 2 white employees in the lunchroom at South Girard Junior High School. There are no records of Charging Party having made allegations of discrimination or harassment during that year first of employment. Mrs. Walker is now deceased and therefore, cannot be interviewed. There is nothing in Charging Party's personnel file evidencing either a written or oral complaint that she was being mistreated during her first year of employment even though she was 1 of only 2 white employees in the lunchroom. No current employees of Respondent are aware of any complaints during that first year.

At the end of the 2003-2004 school year, the other white lunchroom employee asked for a transfer to another school and that transfer was granted.

Brenda Densel, a white female, was hired to replace Mrs. Walker as the Manager of the lunchroom at South Girard for the 2004-2005 Scholastic Year. The Assistant Lunchroom Manager hired was also a white female, Paula Pritchett. Mrs. Pritchett had worked under Mrs. Densel at her prior assignment as Manager of the lunchroom at Ridgecrest Elementary School. After taking over the duties of lunchroom Manager at South Girard, Mrs. Densel became aware of the lack of supervision that had been given the lunchroom employees during the previous year under Mrs. Walker. Mrs. Densel proceeded to organize the lunchroom workers; put the employees in teams of 2; set up a work schedule; assign specific duties to each team which could be rotated at certain intervals; specify how much and what ingredients are to be used; how much food to fix and to inventory the food items.

A major issue that confronted Mrs. Densel in overseeing the Charging Party was the decision to stop the lunchroom employees from taking of too much food home. The employees are entitled to a lunch, and if they do not eat at the school, they are allowed to take that lunch home. This practice was being abused when Mrs. Densel arrived and she stopped it. Charging Party had been one of the employees seen by Mrs. Densel taking home more food than she was authorized to do.

This apparently irritated Charging Party and the gentlemen who lived with her. She and the gentlemen referenced it on several occasions, one of which will be described below.

During her second year of employment Charging Party shared with her supervisors and fellow employees that she also worked part time at McDonalds. She informed then that the manager of McDonalds had stopped the employees from taking too much food home from work. Charging Party is quoted as saying that the manager told her that she could not longer take home 5 to 10 sandwiches to feed her family. All of Charging Party's fellow employees at McDonalds were apparently black.

Charging Party was not terminated because of poor work performance. Instead the reasons for her termination were that she complained constantly to her supervisors and when the supervisor attempted to have Charging Party and the alleged wrongdoer meet together with the supervisor, Charging Party always refused to do so. Charging Party would say something to the effect that "oh, that's all right, I don't want to meet with them." Under these circumstances there was nothing that the Manager or Assistant Manager could do to address any concerns of Charging Party. It appeared to the supervisors that Charging Party wanted to always complain, but never do anything about it. The complaints of Charging Party were of the following types: "so and so is not doing her job; they are not doing their jobs and want me to do their work for them; so and so is picking on me; and that the other employees expected her to pick up their slack." The Manager told Charging Party that if she was going to complain she was going to have to allow the Manager to address the issues. Each time the Charging Party would refuse for a face to face meeting to occur.

On only one occasion did the Charging Party allow the Manager to meet with Charging Party and a fellow employee, Betty Cliatt, a black female. Charging Party and Cliatt never got along. Charging Party always said that Cliatt "didn't like her and always put her down." There was never any indication that this was a racial issue; only a situation where 2 employees did not get along.

A serious incident occurred in October 2004. While at work, Charging Party's finger was cut. Charging Party alleged that another employee, Annie Henry, a black, snatched the clear wrap box from her and that her finger was cut presumably on the serrated cutting edge of the box. Charging Party first told the lunchroom Manager that Ms. Henry had done it intentionally to hurt her. Charging Party then changed her story and said to the Manager that she knew that Ms. Henry did not do it intentionally and that it was an accident.

On this same day in October, Charging Party and the gentleman who lives with her went to the office of the CNP Supervisor, Penny Passmore, a white female, at the main office of the school system. The gentleman was irate; seemingly out of control and started making accusations that: "food was still going out the door (i.e. being taken home by employees); Charging Party was not being treated fairly; the administration was letting the blacks run the school." Because of the hostility of this gentleman, the Mrs. Passmore called in the Assistant Superintendent, Jeff Adams, a white male, to assist. (Mr. Adams is now deceased.) Assistant Superintendent Adams attempted to diffuse the tense situation and advised Charging Party that she could file a complaint on this incident if she so desired. Charging Party never filed a complaint.

3

CNP Supervisor Passmore came to South Girard Junior High School the next day and shared the facts of the above described incident with the lunchroom Manager. Mrs. Densel expressed her concerns about safety and her fear that the gentleman would come to the school and possibly inflict harm on the lunchroom employees or her. Because Charging Party had shown through her actions that she would do anything this gentleman told her to, Mrs. Densel was concerned that there would always be trouble.

On or about that same day, Mrs. Passmore and Mrs. Densel went to the Principal of South Girard, Reggie Sparks, a black male, and informed him of the facts of the incident. During that conversation Mrs. Densel told Mr. Sparks that "unless you don't agree with me, I am going to recommend that Ms. Hutchison be non- renewed for the next school year." Mr. Sparks and Mrs. Passmore both agreed with Mrs. Densel about the future non-renewal.

The action of non-renewal of the contract of Charging Party occurred in the spring of 2005. Assistant Superintendent Adams, CNP Supervisor Passmore and lunchroom Manager Densel, all white, agreed that Charging Party should be non-renewed for the next school year. Mr. Sparks confirmed with Mrs. Densel that he was to non-renew Charging Party. The non-renewal action was taken as outlined above.

Based on the above facts, it is the position of Respondent that Charging Party's allegations of racial discrimination are outrageous and unsubstantiated.

## IV.   CONCLUSION

For the foregoing reasons, Respondent respectfully requests that the EEOC issue a No Cause Determination in this matter.

Please contact me if you have any questions regarding this response.

Sincerely yours,

Sydney S. Smith

SSS/sss
C-05-033

4

PHENIX CITY SCHOOL BOARD

# Meeting will address controversial proposal

## Some leaders fear move could trigger resegregation

**BY HARRY FRANKLIN**
*State Editor*

The Phenix City School Board has called a town hall meeting to discuss a controversial proposal to reorganize middle and elementary schools.

The meeting will be 6 p.m. Nov. 29, at Central High School, but board President Eddie Lowe said details of how the meeting will be conducted have not been worked out.

The reorganization proposal was put forth by Superintendent Larry DiChiara, who missed Thursday's board meeting because he was in Washington lobbying for federal funds to address the need for more school facilities to serve an expected 800 students because of growth at Fort Benning. Some African-American leaders fear the proposal could trigger resegregation in the schools.

The board did not convene for a meeting called by the superintendent Nov. 3 to discuss the plan. It was also not on Thursday's agenda.

Board member John Honeysucker said the school district doesn't need to rush into a plan without sufficient study, and that it should look at other options to find the best way to take care of additional students. He said a study should be done to determine the best way to address growth.

*See SCHOOL, Page 3*

PLAINTIFF'S EXHIBIT
19

# SCHOOL | Proposal might lead to litigation

*From Page 1*

After the Nov. 3 meeting didn't materialize, DiChiara, called by a reporter, said he believes implementing his plan would help slow the flight of white students from the school system. Others, especially some African-Americans, have indicated they are not convinced that would be the result or that his plan is the best solution.

The plan would return the fifth grade to Phenix City's six elementary schools while establishing South Girard and Phenix City Intermediate as neighborhood middle schools — one in the south and one in the north. Each middle school would be fed by three neighborhood elementary schools. Westview Elementary also would have a classroom addition, which DiChiara said would need to be ready for occupancy by the next school year. But the district was on a tight schedule to complete the addition before the called meeting was canceled.

The middle schools would each have magnet programs to attract students from throughout the city. South Girard would have a fine arts magnet and the Intermediate school, a NASA Explorer School, would continue its science emphasis.

But African-American leaders are concerned the plan — placing students into two middle schools with different racial majorities would result in resegregation.

DiChiara said earlier that he believes the plan would slow the continuing gradual withdrawal of white students from the school system and even prevent the possibility that 10 years down the road, the school system could become an all-black system.

Board member Florence Bellamy, who is running for vice president of the Alabama Association of School Boards at its annual conference Dec. 8-10 in Birmingham, said her 17-year-old daughter raised an interesting question after reading DiChiara's comments that the school district could wind up all-black in 10 years.

"I love my community. She does too," Bellamy said. "She read the articles in the newspaper and asked me what they mean. She said, 'There must be something wrong with me.'"

Pointing out the school system recently was declared fully unitary by federal court, Bellamy said, "Unitary means together, being together, working out problems together. We rolled up our sleeves and kept working on it. We were talking about white flight then."

"Hopefully we can get to that," Lowe said. "This is a very sensitive item. We all do need to step up and do what we think is right."

The Alabama Education Association announced Thursday in a letter to members of the community that it considers the proposed "restructuring/reorganization proposal to be a rush job that has not allowed adequate time for public input or discussion."

The letter signed by AEA associate executive secretary Joe L. Reed warned that the proposal violates the Lee vs. Macon consent decree and if pursued "will result in massive and costly litigation."

Since the town hall meeting will be at Central, Honeysucker said a second meeting should be held at South Girard, because it would be affected by the reorganization.

Lowe said there is a precedent for holding a second meeting, and said the board should hold one at South Girard. He said he has not discussed that with DiChiara, but will after the superintendent returns from Washington.

"I want to make one more appeal to you, the superintendent and the rest downtown," said Honeysucker. "Consider the people, the fiber of the community, before we draw a conclusion on what we are going to do. We do know something must be done."

Contact Harry Franklin at (706) 571-8521 or hfranklin@ledger-enquirer.com

Privacy Fencing
United Fence
706 56-FENCE
(322-3607)

Friends & Family

non-renew. The racial composition of the Board at the time of non-renewal was 3 white males; 1 white female; 2 black males and 1 black female. The Board voted unanimously in favor of the Superintendent's personnel recommendations.

(c)  Documentation supporting the non-renewal is found in the Plaintiff's Personnel File and the relevant portions of the Board Minutes of May 12, 2005 which are attached hereto as Exhibit C.

3.     Please describe, in detail, the plaintiff's job duties and assignments while she was employed with the defendant and the race and job title of each person who replaced plaintiff and/or assumed any of her job duties once her contract was not renewed.

**ANSWER:**

(a)  See official job description for Plaintiff which is attached hereto as Exhibit D and the Response of the Board filed with the EEOC.

(b)  Plaintiff's replacement is Mary Walker who is black and who transferred from a similar position at Central High School.

4.     Please provide the names of all employees, who were employed as a Child Nutrition Program Worker with the defendant from January 1, 2002 to the present, depicting their race, job title and dates of employment.

**ANSWER:**

See Exhibit E attached hereto.

5.     Please describe, in detail, each and every time the plaintiff complained about harassment, discrimination or unfair treatment on the job, including the date, subject matter, who received the complaint, and any action taken as a result of the complaint.

**ANSWER:**

Plaintiff did not complain about harassment or discrimination on the job to

3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| ELIZABETH LYNNE HUTCHINSON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO: |
| vs. | ) | CV-06-00700-WHA |
| | ) | JURY DEMAND |
| | ) | |
| PHENIX CITY BOARD OF EDUCATION,) | | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION

**COMES NOW** the plaintiff, Elizabeth Lynne Hutchinson, who submits the following responses to the Defendants' First Interrogatories and Requests for Production. Plaintiff incorporates herewith, in addition to the Objections listed below, by reference her General Objections served on February 26, 2007. Plaintiff reserves the right to supplement these answers.

## INTERROGATORIES

1. State and describe in detail every fact upon which Plaintiff bases the allegations in her Complaint that these Defendants discriminated against Plaintiff on the basis of her race with respect to
    (a) harassment,

1

(b) hostile work environment
(c) work/job assignments,
(d) termination and/or non-renewal, and
(e) other terms and conditions of her employment.

**OBJECTION:**    Plaintiff objects to this interrogatory because it is vague, overly broad, unduly burdensome, calls for a legal conclusion in that it requests that the plaintiff make an application of law to the facts of this case, and otherwise seeks information beyond the permissible scope of the Federal Rules.

**RESPONSE:**    From the first week of my employment at Phenix City in July of 2003 until the last week of my employment, racial comments and remarks were made to me by Betty Cliatt. Cliatt made many so comments to me and made them on a daily basis, so I can't remember them all. Below is a list of the comments and description of events that I currently remember.

1.    Cliatt said she was going to send me to the black school so I could learn to do things the black way.
2.    "White people are stupid"
3.    "White people can't cook"
4.    "White people don't know how to do anything"
5.    "White people are always putting the blame on black people because they are black"
6.    "It's the white people doing the crimes"
7.    "White people are sorry"
8.    "All white people are white trailer trash"
9.    "White people take things that don't belong to them"
10.    "Whites are nothing but white trailer trash."
11.    "Ain't no white trailer trash going to be putting their face over my food."
12.    During the Michael Jackson trial Cliatt stated that it was all about some white trash trying to get

2

Jackson's money.

13. White people are just ugly, the way they look as human beings.

14. Why is Brenda Densel sending her white trailer trash daughter to check on us, she has no authority over us.

15. Cliatt would criticize Brenda Densel saying things like "this white trailer trash don't know what she's doing."

16. White trailer trash abuses the black people.

17. Its actually white people doing the crimes and blaming it on the black people.

18. White people are up to no good.

19. White trailer trash has to send her white trailer trash to check up on us.

Additionally, Betty Cliatt made remarks to me like "When you walk past me you say excuse me." However, she didn't do this to the black employees. Cliatt did not want to, and on occasion, would refuse to share the sink or work area with me, however, she would share with the other black girls. Many times, if Cliatt was assigned to wash pans, she would not wash any of the pans that I gave to her if she was washing dishes but she would wash pans she received from other girls. Cliatt often falsely accused me of taking her food. Cliatt would go out of her way to interfere with me doing my job and would try to make things harder for me. Cliatt did not treat our black co-workers this way.

I observed Cliatt providing meals to black school children who were over the $5.00 credit limit for unpaid food and denying meals to white children who were likewise over the limit. If we had a choice between potatoe tots or fries, Betty would hand out what the black children wanted, but with the white children, Betty would not give them what they wanted.

Cliatt would deliberately make a mess on the floor

3

when I had been assigned to mop. She would pour food juice out of the pots onto the floor, look at me and then laugh and tell me that I had missed a spot. A few times when Cliatt was mopping and I was washing pans, she came over to where I was working and took the wet mop and purposely swung it towards my feet and legs soaking my pants and shoes. Cliatt then looked at me and laughed.

One day, a co-worker at South Girard cut my finger by snatching tongs from my hand. I went to Densel's office to get a bandage. Densel took me to Passmore's office. Densel told me words to the effect "Something needs to be done, I don't know how to handle the girls. I can't take any more of this. I've got to have some help with the way they have been doing. I've never had to deal with a situation like this. Its gone on long enough and now I've got a good reason to take you over to the office and get some help. I just don't know what to do, maybe Mrs. Passmore and Mr. Adams do."

After getting to the School Board office, Densel and Passmore met privately. Then Passmore told me to go home and talk about the situation with my husband and decide if I want to stay at South Girard or transfer.

My husband and I then went to talk with Passmore and Adams about the situation at the school. My lawyers have produced a copy of the audio tape of that conversation.

The next day, November 10, 2004 when I went back to work Densel acted angry with me because we had gone to Passmore and Adams. From then on it seemed as if Densel was unwilling to help me. The harassment continued and in fact things got worse. Other substitute workers did not want to come back to work in the kitchen at South Girard. Then Densel went out on some kind of medical leave and began sending her daughter to the South Girard to check up on the CNP workers. Cliatt didn't like this. She would make

4

statements like "White trailer trash has to send her white trailer trash to check up on us" and "Why is Brenda Densel sending her white trailer trash daughter to check on us, she has no authority over us." The harassment continued up until my termination from the schools. The supervisors and managers knew what was going on and refused to put an end to the harassment. Instead of dealing with the problem, they decided to terminate me for complaining about the harassment.

On May 13, 2005. Mr. Adams came to the school. The school office called for me to report to the office while I was working in the cafeteria. When I get to the office, Mr. Adams was there along with assistant principal, Mr. Langly. Adams told me, I would not have a job after this year with the school system.

I asked for a letter of recommendation from Paula Pritchett, but Densel told Pritchett no. I wrote a letter to Mr. DiChiara asking for copies of my personnel file and my evaluations that was done by my manager, Brenda Densel, at South Girard in the cafeteria. I did not receive my evaluation from Densel, but I did receive my evaluation that was done by Beverly Walker.

After that I went to Superintendent DiChiara to complain about my termination and see what could be done. My lawyers have produced a copy of the audio tape of that conversation.

2.    Identify every document that describes, supports evidences, or refers to any or all of the facts and details upon which Plaintiff bases the allegations in her Complaint that the Defendants discriminated against Plaintiff on the basis of her race with respect to Interrogatory 1.a) through 1.e) above.

**OBJECTION**:    Plaintiff objects to this interrogatory because it is vague, overly broad, unduly burdensome, calls for a legal conclusion in that it requests that the plaintiff make an application of law to the facts of this case, seeks

5